**In re COMMITMENT OF Michael FISHER.**

No. 04–0112.

Supreme Court of Texas.

Argued Nov. 30, 2004.

Decided May 20, 2005.

Ryan D. Clinton, Asst. Solicitor Gen., Greg Abbott, Atty. Gen., Barry Ross McBee, Edward D. Burbach, and Rafael Edward Cruz, Austin, for State.

Kenneth W. Balusek, Daniel E. Maeso, Nelda F. Williams, State Counsel for Offenders, and Kim B. Vernon, Division Director, Huntsville, for Respondent.

Autumn Lewis, Huntsville, for Amicus Curiae Special Prosecution Unit.

Chief Justice JEFFERSON delivered the opinion of the Court.

A jury determined that Michael James Fisher suffered from a behavioral abnormality that made him likely to engage in a predatory act of sexual violence, and the trial court ordered Fisher committed pursuant to the Civil Commitment of Sexually Violent Predators Act (the "Act"). The court of appeals reversed, holding that the Act was punitive, not civil, and violated Fisher's due process rights. Because we conclude that a commitment proceeding under the Act is civil and that Fisher received the process he was due under the United States and Texas Constitutions, we reverse the court of appeals' judgment and render judgment civilly committing Fisher pursuant to the Act.

## I

### Civil Commitment of Sexually Violent Predators

Fisher argues that the Act denies procedural and substantive protections to those alleged to be sexually violent predators. To assess the merits of this argument, we must examine how the statute operates with respect to a person adjudged to be a predator under the Act. In 1999, the Legislature enacted the Civil Commitment of Sexually Violent Predators Act, now codified at chapter 841 of the Health and Safety Code. *See* The Civil Commitment of Sexually Violent Predators Act, 76th Leg., R.S., ch. 1188, § 4.01, 1999 Tex. Gen. Laws 4143 (codified as amended at Tex. Health & Safety Code ch. 841). In so doing, the Legislature found that:

[A] small but extremely dangerous group of sexually violent predators exists and ... those predators have a behavioral abnormality that is not amenable to traditional mental illness treatment modalities and that makes the predators likely to engage in repeated predatory acts of sexual violence. The legislature finds that the existing involuntary commitment provisions of Subtitle C, Title 7, are inade-

quate to address the risk of repeated predatory behavior that sexually violent predators pose to society. The legislature further finds that treatment modalities for sexually violent predators are different from the traditional treatment modalities for persons appropriate for involuntary commitment under Subtitle C, Title 7. Thus, the legislature finds that a civil commitment procedure for the long-term supervision and treatment of sexually violent predators is necessary and in the interest of the state.

Tex. Health & Safety Code § 841.001. A sexually violent predator ("SVP") is a "repeat sexually violent offender"[1] who "suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence." *Id.* § 841.003(a). A "behavioral abnormality" is "a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id.* § 841.002(2).

The Act creates a multidisciplinary team to review available records of an SVP candidate. *Id.* § 841.022. The Texas Department of Criminal Justice ("TDCJ") or the Texas Department of Mental Health and Mental Retardation ("TDMHMR") must notify the multidisciplinary team of the anticipated release of a person who is serving a sentence for a sexually violent offense (or who was committed after having been adjudged not guilty by reason of insanity of a sexually violent offense) and who may be a "repeat sexually violent offender." *Id.* § 841.021. Within sixty days of the notice, the team must (1) determine whether the person is a repeat sexually violent offender and whether the person is likely to commit another such offense after release; (2) give notice of that determination; and (3) recommend the assessment of the person for a behavioral abnormality. *Id.* § 841.022(c).

Within sixty days of the team's recommendation, the TDCJ or the TDMHMR, as appropriate, must engage an expert to determine whether the person suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence. *Id.* § 841.023(a). If the TDCJ or the TDMHMR concludes

1. A "repeat sexually violent offender" is a person who:
 is convicted of more than one sexually violent offense and a sentence is imposed for at least one of the offenses or if:
 (1) the person:
 (A) is convicted of a sexually violent offense, regardless of whether the sentence for the offense was ever imposed or whether the sentence was probated and the person was subsequently discharged from community supervision;
 (B) enters a plea of guilty or nolo contendere for a sexually violent offense in return for a grant of deferred adjudication;
 (C) is adjudged not guilty by reason of insanity of a sexually violent offense;
 (D) is adjudicated by a juvenile court as having engaged in delinquent conduct constituting a sexually violent offense and

 is committed to the Texas Youth Commission under Section 54.04(d)(3) or (m), Family Code; and
 (2) after the date on which under Subdivision (1) the person is convicted receives a grant of deferred adjudication, is adjudged not guilty by reason of insanity, or is adjudicated by a juvenile court as having engaged in delinquent conduct, the person commits a sexually violent offense for which the person:
 (A) is convicted, but only if the sentence for the offense is imposed; or
 (B) is adjudged not guilty by reason of insanity.
 Tex. Health & Safety Code § 841.003. Thus, although the Act uses the term "offender" it includes even those persons adjudged not guilty by reason of insanity. *Id.*

that the person suffers from a behavioral abnormality, the department must give notice and corresponding documentation to the state's attorney[2] not later than sixty days after receiving the team's recommendation. *Id.* § 841.023(b).

If an SVP candidate is referred to the state's attorney, the attorney may file, in a Montgomery County[3] district court other than a family district court, a petition alleging that the person is a sexually violent predator and stating facts sufficient to support the allegation. *Id.* § 841.041(a). The petition must be filed not later than ninety days after the SVP candidate is referred to the state's attorney, and it must be served as soon as practicable after filing. *Id.* § 841.041(b).

Within 270 days after the petition is served, the judge must conduct a trial to determine whether the person is an SVP. *Id.* § 841.061(a). The alleged SVP has the right to an immediate examination by an expert and to a jury trial. Additionally, the alleged SVP is entitled to appear at the trial, present evidence, cross-examine witnesses, and view and copy all petitions and reports in the court file. *Id.* §§ 841.061(b)-(d). At all stages of the proceedings, the alleged SVP is entitled to the assistance of counsel, and indigents are appointed counsel by the court.[4] *Id.* § 841.144. A judge or jury then determines whether, beyond a reasonable doubt, the person is an SVP. A jury determination must be unanimous. *Id.* § 841.062.

If a person is adjudged an SVP, the judge must commit the person for outpa-tient treatment and supervision, to begin on the date of the SVP's release from a correctional facility or discharge from a state hospital and to continue "until the person's behavioral abnormality has changed to the extent that the person is no longer likely to engage in a predatory act of sexual violence." *Id.* § 841.081. Before entering an order directing an SVP's outpatient civil commitment, the judge must impose on the SVP "requirements necessary to ensure the SVP's compliance with treatment and supervision and to protect the community." *Id.* § 841.082(a). Those constraints include: requiring the SVP to live in a particular location; prohibiting contact between the SVP and victims or potential victims; prohibiting the SVP's use of alcohol, inhalants, or controlled substances; requiring participation in and compliance with a particular course of treatment; requiring the SVP to submit to tracking and refrain from tampering with tracking equipment; prohibiting the SVP from changing residence without prior authorization; and "any other requirements determined necessary by the judge." *Id.* Violation of one of the commitment requirements is a third-degree felony. *Id.* § 841.085.

The statute provides for biennial expert examinations and judicial review of the committed person's status. *Id.* §§ 841.101, 841.102. Additionally, if the case manager determines that the SVP's behavioral abnormality has changed to the extent that he or she is no longer likely to engage in a predatory act of sexual violence, the case manager must authorize

**2.** The "[a]ttorney representing the state" means an attorney employed by the prison prosecution unit to initiate and pursue a civil commitment proceeding under the Act. Tex. Health & Safety Code § 841.002(1).

**3.** The Act requires that all SVP petitions be filed in Montgomery County. *Id.* § 841.041(a). Montgomery County is adja-cent to Walker County, home to the Texas State Penitentiary at Huntsville.

**4.** In such a case, the court appoints counsel through the Office of State Counsel for Offenders. Tex. Health & Safety Code §§ 851.005, 841.144(b).

the SVP to petition for release. *Id.* § 841.121(a). Finally, at any time and even absent the case manager's authorization, the SVP has the right to file a petition for release.[5] *See id.* §§ 841.122–24.

In passing the Act, Texas became one of seventeen states that has enacted legislation providing for the civil commitment of sexually violent predators. *See* Ariz.Rev. Stat. §§ 36–3701 to 3717; Cal. Welf. & Inst.Code §§ 6600–6609.3; Fla. Stat. Ann. §§ 394.910–.931; 725 Ill. Comp. Stat. 207/1–99; Iowa Code §§ 229A.1–.16; Kan. Stat. Ann. §§ 59–29a01 to 29a21; Mass. Gen. Laws ch. 123A, §§ 1–16; Minn.Stat. §§ 253B.185(1)-(7); Mo. Ann. Stat. §§ 632.480–.513; N.J. Stat. Ann. §§ 30:4–27.24 to 27.38; N.D. Cent.Code §§ 25–03.3–01 to 03.3–23; 42 Pa. Cons.Stat. §§ 6401–6409; S.C.Code Ann. §§ 44–48–10 to 170; Va.Code Ann. §§ 37.1–70.1–.19; Wash. Rev.Code §§ 71.09.010–.902; Wis. Stat. §§ 980.01–.12. All but Texas have chosen to use inpatient civil commitment, which requires housing the individuals in secure facilities like a prison. Walter J. Meyer, III et al., *Outpatient Civil Commitment in Texas for Management and Treatment of Sexually Violent Predators: A Preliminary Report,* 47(4) Int'l J. Offender Therapy & Comp. Criminology 396, 397 (2003). By contrast, the Texas Act requires outpatient "commitment," involving intensive treatment and supervision. *Id.* The Texas Act is also unique in that it imposes criminal penalties for violating the conditions of confinement.[6] *See* Tex. Health & Safety Code § 841.085.

To date, two of our courts of appeals have upheld the Act's constitutionality against various challenges. *In re Commitment of Browning,* 113 S.W.3d 851, 866 (Tex.App.-Austin 2003, pet. denied); *Beasley v. Molett,* 95 S.W.3d 590, 609 (Tex. App.-Beaumont 2002, pet. denied). A third, the court of appeals in this case, has held that the Act is "manifestly punitive, both facially and as applied," and, therefore, unconstitutional. 123 S.W.3d 828, 850.

## II

### Background

On January 20, 1987, Michael James Fisher pleaded guilty to second-degree sexual assault and was sentenced to two years' confinement in the Texas Department of Corrections. While on parole for that conviction, on August 17, 1987, Fisher was again indicted, this time for first-degree aggravated sexual assault. Fisher pleaded guilty to that charge and was sentenced to ten years' confinement. While on parole for that conviction, Fisher was charged with, but not convicted of, assault in June 1996. His parole was revoked at that time. In May 1999, he again violated the conditions of his release, and his parole was once more revoked. On numerous occasions between 1991 and 1996, Fisher

---

5. A petition for release filed without the case manager's authorization, however, is subject to a more stringent standard of review by the trial court. *See* Tex. Health & Safety Code § 841.123.

6. Some states that utilize inpatient commitment do, however, impose criminal penalties for escape from confinement or leaving the state without permission. *See, e.g.,* Fla. Stat. § 394.927(1) (creating second-degree felony for escape or attempted escape from civil commitment confinement); Iowa Code

§ 229A.5B(2) (imposing criminal penalties on individuals who (1) leave or attempt to leave commitment facilities, (2) are absent "from a place where the person is required to be present," or (3) leave or attempt to leave the custody of civil-commitment personnel); Mo. Rev.Stat. § 575.195 (criminalizing an escape from commitment or detention); Va.Code § 37.1–70.19 (imposing criminal penalties on committed individuals on conditional release who leave state without permission).

was hospitalized for psychiatric problems. On October 25, 2000, the State of Texas petitioned to have Fisher adjudicated a sexually violent predator. Fisher filed a general denial and demanded a jury trial.

A jury was impaneled, and the case proceeded to trial. Fisher moved for a hearing on his competency to stand trial. Outside the presence of the jury, the trial court conducted an evidentiary hearing, in which Fisher's two experts testified that Fisher was mentally incompetent. The first expert, an attorney-psychologist, testified that Fisher lacked a factual or rational knowledge of the proceedings and was unable to assist in his defense. The second, Fred Lanier Fason, M.D., a psychiatrist, agreed that Fisher was incompetent and did not have a present ability to consult with his lawyer with a reasonable degree of rational understanding. The State did not offer controverting evidence. The trial court denied the motion.

At trial, Dr. Fason testified that Fisher suffered from paranoid schizophrenia, antisocial personality disorder, and mild mental retardation. Fason agreed that Fisher's problems with impulse control could be described as "a semi careening down a hill without brakes." Fason testified that Fisher would be a severe danger to others if released, unless new or different medication proved more effective in curbing his criminal impulses.

Doug Bertling, a licensed psychologist employed by the Sex Offender Treatment Program, testified on behalf of the State. Bertling conducts risk assessments on sex offenders and uses actuarial variables to predict future sexual reoffense. Bertling testified that his office evaluates the approximately fifty sex offenders who are released "to the streets" each week in Texas. Bertling completed two risk assessment evaluations on Fisher: the Static 99 and the MnSOST–R. On the Static 99, Fisher received a score of four, which placed him in the high risk category for future sexual reoffense. Fisher scored a ten on the MnSOST–R, indicating a seventy percent recidivism level.

Dr. Billy Burleson, a licensed psychologist, also testified on behalf of the State. Burleson interviewed Fisher and concluded that Fisher suffered from antisocial personality disorder.[7] According to Burleson, individuals suffering from this disorder have no conscience, no respect for legal authority, are self-centered, and tend to have a higher sex drive than others. Burleson also testified that Fisher suffered from paranoid schizophrenia; he did not consider himself guilty of his sexual offenses and claimed the victims accused him wrongly. In Burleson's opinion, "[d]ue to his mental illness and mental retardation, Fisher's insight and judgment are considered highly unreliable." Burleson recommended that Fisher be considered for indefinite civil commitment upon his release. In Burleson's opinion, there was a high probability that, "given the opportunity, [Fisher] would likely offend again." According to Burleson, Fisher needed close supervision and monitoring and would benefit from working with a case worker. Burleson testified that Fisher was the type of individual likely to commit a predatory act in the future, and it was significant to Burleson that Fisher violated his parole and raped another woman while on parole.

Dr. Lisa Kay Clayton, a forensic psychiatrist, also testified on behalf of the State. She agreed that Fisher was schizophrenic, suffered from antisocial personality disor-

---

**7.** Burleson testified that antisocial personality disorder was formerly known as psychopathy, and that they "mean[ ] the same thing."

der, and was borderline mentally retarded. According to Clayton, while Fisher was an inpatient at Rusk State Hospital, he tried to kick out a window, threatened to beat an officer to death, and threatened to rape and strangle a nurse. Clayton testified that Fisher had a very high likelihood of reoffending, and agreed with Fason's analogy that Fisher was like a "large truck going downhill with no brakes." She testified that medication and a very structured, monitored environment might provide "brakes" for Fisher. In her opinion, if Fisher stayed on his medication, he had a high likelihood of success in complying with the civil commitment requirements.

The trial court admitted certified copies of Fisher's two penitentiary packets detailing his 1987 sexual assault and aggravated sexual assault convictions. At the close of evidence, on the State's motion, the trial court directed a verdict that Fisher was a repeat sexually violent offender as defined in the Act. After deliberating for approximately two-and-a-half hours, the jury unanimously found, beyond a reasonable doubt, that Fisher suffered from a behavioral abnormality that made him likely to engage in a predatory act of sexual violence.

The trial court made findings of fact and conclusions of law and rendered judgment on June 12, 2001. The judgment ordered Fisher committed to treatment and supervision by the Council on Sex Offender Treatment. The judgment imposed several requirements on Fisher: he must live at a residence approved by his case manager; he is prohibited from participating in programs involving children or going within 1000 feet of premises where children commonly gather; he must be fitted with satellite monitoring equipment; he must provide blood and hair samples to the State's DNA Data Bank; he must not contact the victims of his crimes; he must reside in Texas and must not leave the state without court authorization; he must not consume alcohol or controlled substances; and he must "comply with all terms and conditions of this court, his treatment provider and case manager and enter into a written agreement with his treatment provider and case manager specifying all of the terms and conditions of his treatment and case management including as are attached in Civil Commitment Requirements: Treatment and Supervision Contract." An unsigned copy of the Treatment and Supervision Contract is appended to the judgment and contains some ninety-seven additional conditions by which Fisher must abide.

Fisher moved for a new trial, asserting that the trial court abused its discretion in denying his request that a jury determine his competency to stand trial, depriving him of substantive and procedural due process. After a hearing, the trial court denied the motion.

Fisher appealed, contending that the Act was punitive, both facially and as applied, because he did not have the mental ability to understand or comply with the commitment order. Second, Fisher argued that his due process rights were violated because he was forced to proceed to trial when he was incompetent. The court of appeals, sitting en banc with one justice dissenting, agreed with Fisher, concluding that the Act was punitive and that "Fisher was denied substantive and procedural due process." 123 S.W.3d at 850–851. It held that Fisher was entitled to rights under the criminal law, including the right to effectively exercise his right to counsel and the right to be competent at trial. *Id.* at 850. Additionally, the court of appeals concluded that "substantive due process requires [that Fisher] be mentally competent to comply with the order of commitment." *Id.* Because the court of appeals

"only address[ed] Fisher's complaints concerning his mental incapacity," it did not reach Fisher's other complaints.[8] *Id.* at 831–32. We granted the State's petition for review to address several aspects of the Act's constitutionality. 47 Tex. Sup. Ct. J. 1028 (Sept. 3, 2004).

## III

### Constitutional Challenges

■ It is unclear whether the court of appeals based its decision on the United States Constitution, the Texas Constitution, or both. *See, e.g.,* 123 S.W.3d at 837, 850. Where, as here, the parties have not argued that differences in state and federal constitutional guarantees are material to the case, and none is apparent, we limit our analysis to the United States Constitution and assume that its concerns are congruent with those of the Texas Constitution. *New Times, Inc. v. Isaacks,* 146 S.W.3d 144, 150 (Tex.2004). An analysis of the constitutionality of a statute begins with a presumption of validity. *Barshop v. Medina County Underground Water Conservation Dist.,* 925 S.W.2d 618, 629 (Tex. 1996).

### A

#### Due Process

■ In determining Fisher's competency-related due process rights, we must first examine whether the Act is punitive, not civil, as the court of appeals held. 123 S.W.3d at 850; *see also Kansas v. Hendricks,* 521 U.S. 346, 360–69, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) (evaluating

whether Kansas statute was civil or criminal to determine validity of SVP's double jeopardy and *ex post facto* claims). While the criminal trial of an incompetent defendant violates due process, *see Medina v. California,* 505 U.S. 437, 453, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992); *McDaniel v. State,* 98 S.W.3d 704, 709 (Tex.Crim.App. 2003) ("The conviction of an accused person while he is legally incompetent violates due process."), generally civil cases may proceed even if one party is incompetent, *see, e.g.,* Tex. Health & Safety Code § 576.001(3); *Stubbs v. Ortega,* 977 S.W.2d 718, 722 (Tex.App.-Fort Worth 1998, pet. denied). "[T]he same concerns and concomitant protections that arise in a criminal case do not necessarily arise in the SVP[ ] area," and "this principle is key to the determination of whether [an SVP] holds a fundamental right to be competent during the SVP[ ] proceedings." *In re Detention of Cubbage,* 671 N.W.2d 442, 447 (Iowa 2003). Competency claims can raise both substantive and procedural due process concerns. *Walton v. Angelone,* 321 F.3d 442, 459 (4th Cir.2003); *Gilbert v. Mullin,* 302 F.3d 1166, 1178 (10th Cir. 2002).

In *Kansas v. Hendricks,* the United States Supreme Court upheld the constitutionality of a Kansas statute providing for inpatient civil commitment of sexually violent predators.[9] 521 U.S. at 371, 117 S.Ct. 2072. The Court recognized that while freedom from physical restraint has always been at the core of the liberty the due process clause protects, that liberty

---

**8.** Fisher also alleged that the statute and commitment order were unconstitutionally vague and that requiring him to testify violated his fifth amendment privilege against self-incrimination. 123 S.W.3d at 831.

**9.** The court of appeals stated, incorrectly, that *Hendricks* was a "plurality opinion." 123

S.W.3d at 839. Five justices joined the opinion, making it the opinion of the Court. *Hendricks,* 521 U.S. at 348, 117 S.Ct. 2072 ("Thomas J., delivered the opinion of the Court, in which Rehnquist, C.J., and O'Connor, Scalia, and Kennedy, JJ., joined.").

interest is not absolute and may be overridden even in the civil context. *Id.* at 356, 117 S.Ct. 2072.

Accordingly, States have in certain narrow circumstances provided for the forcible civil detainment of people who are unable to control their behavior and who thereby pose a danger to the public health and safety. See, *e.g.,* 1788 N.Y. Laws, ch. 31 (Feb. 9, 1788) (permitting confinement of the "furiously mad"); see also A. Deutsch, The Mentally Ill in America (1949) (tracing history of civil commitment in the 18th and 19th centuries); G. Grob, Mental Institutions in America: Social Policy to 1875 (1973) (discussing colonial and early American civil commitment statutes). We have consistently upheld such involuntary commitment statutes provided the confinement takes place pursuant to proper procedures and evidentiary standards. See *Foucha* [*v. Louisiana*]*, supra,* [504 U.S. 71,] at 80, 112 S.Ct. [1780, 118 L.Ed.2d 437 (1992) ]; *Addington v. Texas,* 441 U.S. 418, 426–27, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). It thus cannot be said that the involuntary civil confinement of a limited subclass of dangerous persons is contrary to our understanding of ordered liberty.

*Id.* at 357, 117 S.Ct. 2072. The Court examined the Kansas act and noted that it was "of a kind" with other civil commitment statutes: It required a finding of future dangerousness and then linked that finding to the existence of a "mental abnormality" or "personality disorder" that made it difficult, if not impossible, for the person to control his or her dangerous behavior. *Id.* at 358, 117 S.Ct. 2072. Thus, the Court concluded that the Kansas statute's definition of "mental abnormality" satisfied substantive due process requirements. *Id.* at 360, 117 S.Ct. 2072. The Court also determined that the Kansas SVP statute was civil and therefore "com-

port[ed] with due process requirements and neither [ran] afoul of double jeopardy principles nor constitute[d] an exercise in impermissible *ex post facto* lawmaking." *Id.* at 371, 117 S.Ct. 2072. ·

Relying on *Hendricks,* courts in fourteen states have determined that their SVP civil commitment schemes are civil, not criminal. *See In re Leon G.,* 204 Ariz. 15, 59 P.3d 779, 782 (2002); *Hubbart v. Superior Court,* 19 Cal.4th 1138, 81 Cal. Rptr.2d 492, 969 P.2d 584, 606–11 (1999); *Westerheide v. State,* 831 So.2d 93, 103 (Fla.2002); *In re Det. of Samuelson,* 189 Ill.2d 548, 244 Ill.Dec. 929, 727 N.E.2d 228, 234–35 (2000); *In re Det. of Garren,* 620 N.W.2d 275, 279–83 (Iowa 2000); *In re Hay,* 263 Kan. 822, 953 P.2d 666, 673 (1998); *Commonwealth v. Bruno,* 432 Mass. 489, 735 N.E.2d 1222, 1230–32 (2000); *In re Linehan,* 594 N.W.2d 867, 870, 878 (Minn.1999); *In re Gibson,* —— S.W.3d ——, ——, 2004 WL 766115 (Mo. Ct.App.2004); *In re Civil Commitment of J.H.M.,* 367 N.J.Super. 599, 845 A.2d 139, 144 (Ct.App.Div.2003); *In re M.D.,* 598 N.W.2d 799, 805–06 (N.D.1999); *In re Matthews,* 345 S.C. 638, 550 S.E.2d 311, 316–17 (2001); *In re Det. of Turay,* 139 Wash.2d 379, 986 P.2d 790, 812–13 (1999); *In re Commitment of Rachel,* 254 Wis.2d 215, 647 N.W.2d 762, 777–78 (2002); *see also State v. Bellamy,* 178 N.J. 127, 835 A.2d 1231, 1237 (2003) (holding that legislative intent behind SVP act was regulatory, not punitive); *McCloud v. Commonwealth,* 269 Va. 242, 609 S.E.2d 16, 21 (2005) (noting that "a proceeding under the SVPA is a civil one").

**1. Legislative Intent**

 In determining whether a statute is civil or criminal, a court must first ascertain whether the legislature intended the statute to establish civil proceedings. "[D]etermining the civil or punitive nature

of an Act must begin with reference to its text and legislative history." *Seling v. Young,* 531 U.S. 250, 262, 121 S.Ct. 727, 148 L.Ed.2d 734 (2001). "A court must first ask whether the legislature, 'in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other.'" *Hudson v. United States,* 522 U.S. 93, 99, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997) (quoting *United States v. Ward,* 448 U.S. 242, 248, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980)). A court will reject the legislature's manifest intent only where a party challenging the Act provides "'the clearest proof'" that the statutory scheme is so punitive in either purpose or effect as to negate the State's intention. *Hendricks,* 521 U.S. at 361, 117 S.Ct. 2072 (quoting *Ward,* 448 U.S. at 248–49, 100 S.Ct. 2636). Because a court first examines legislative intent then proceeds to review the statutory effects, this process has become known as the "intent-effects test." *See Moore v. Avoyelles Corr. Ctr.,* 253 F.3d 870, 872 (5th Cir.2001). The categorization "'is first of all a question of statutory construction,'" and if the Legislature meant to establish civil proceedings, we generally defer to the legislature's stated intent. *Hendricks,* 521 U.S. at 361, 117 S.Ct. 2072 (quoting *Allen v. Illinois,* 478 U.S. 364, 368, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986)).

The Texas statute refers to a "civil commitment procedure," much like the Kansas statute at issue in *Hendricks. See id.;* Tex. Health & Safety Code § 841.001. Additionally, the legislative findings state that public safety and treatment—not punishment—are the primary statutory goals. *See id.* § 841.001 (citing legislative finding that "a civil commitment procedure for the long-term supervision and treatment of sexually violent predators is necessary and in the interest of the state"); *Hendricks,* 521 U.S. at 383, 117 S.Ct. 2072 (Breyer, J., dissenting) ("We have generally given considerable weight to the findings of state and lower federal courts regarding the intent or purpose underlying state officials' actions...."). Unquestionably, the Legislature gave the Act a civil edifice.

## 2. Statute's Purposes and Effects

■ Although this "civil label is not always dispositive," *Allen,* 478 U.S. at 369, 106 S.Ct. 2988, we will reject the legislature's manifest intent only if Fisher provides "'the clearest proof' that 'the statutory scheme [is] so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil.'" *Hendricks,* 521 U.S. at 361, 117 S.Ct. 2072 (quoting *Ward,* 448 U.S. at 248–49, 100 S.Ct. 2636). In making this determination, the Supreme Court has relied on the "useful guideposts" identified in *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168–169, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). *Hudson,* 522 U.S. at 99, 118 S.Ct. 488. These factors, while "neither exhaustive nor dispositive,"[10] *Ward,* 448 U.S. at 249, 100 S.Ct. 2636, include: (1) whether the sanction involves an affirmative disability or restraint; (2) whether it has historically been regarded as a punishment; (3) whether it comes into play only on a finding of scienter; (4) whether its operation will promote the traditional aims of punishment-retribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether an alternative purpose to which it may rationally be connected is assignable for it; and (7) whether it appears excessive in relation to the alternative purpose as-

---

**10.** In determining that the Kansas SVP Act at issue in *Hendricks* was civil, the Supreme Court considered some, but not all, of the *Kennedy* factors. *See Hendricks,* 521 U.S. at 361–69, 117 S.Ct. 2072.

signed. *Kennedy*, 372 U.S. at 168–69, 83 S.Ct. 554. It is important to note, however, that these factors "may often point in differing directions" and "must be considered in relation to the statute on its face." *Id.* at 169, 83 S.Ct. 554.

### a. Affirmative Disability or Restraint

The Texas Act imposes no physical restraint and therefore "does not resemble the punishment of imprisonment, which is the paradigmatic affirmative disability or restraint." *Smith v. Doe*, 538 U.S. 84, 100, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003). Nonetheless, the Act imposes affirmative disabilities on Fisher. He must reside at a particular location, may not leave Texas without permission, must be fitted with satellite monitoring equipment, and faces a host of restrictions on his activities. *See id.* at 99–100, 123 S.Ct. 1140 (noting that appropriate inquiry is "how the effects of the Act are felt by those subject to it"). Even in light of such restraints, however, the Supreme Court in *Hendricks* concluded that "the mere fact that a person is detained does not inexorably lead to the conclusion that the government has imposed punishment." *Hendricks*, 521 U.S. at 363, 117 S.Ct. 2072 (internal quotation omitted). While the Act imposes affirmative disabilities and restraints on Fisher, they are certainly no greater than the inpatient commitment held to be civil in *Hendricks*. Accordingly, in light of *Hendricks*, this factor alone does not compel a conclusion that the statute is punitive.

### b. Historical View

Thus, we turn to the second *Kennedy* factor. Historically, civil commitment has not been viewed as punishment. "The State may take measures to restrict the freedom of the dangerously mentally ill. This is a legitimate nonpunitive governmental objective and has been historically so regarded." *Hendricks*, 521 U.S. at 363, 117 S.Ct. 2072. The United States Supreme Court has, in fact, cited the confinement of "'mentally unstable individuals who present a danger to the public' as one classic example of nonpunitive detention." *Id.* (quoting *United States v. Salerno*, 481 U.S. 739, 748–49, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)); *see also Addington v. Texas*, 441 U.S. 418, 428, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) ("In a civil commitment state power is not exercised in a punitive sense."). As the *Hendricks* Court noted: "If detention for the purpose of protecting the community from harm *necessarily* constituted punishment, then all involuntary civil commitments would have to be considered punishment. But we have never so held." [11] *Hendricks*, 521 U.S. at 363, 117 S.Ct. 2072. In view of civil commitment's historical purpose, this factor weighs against a finding of punitive effect.

### c. Retribution, Deterrence, and Scienter

■ Moreover, like the Kansas statute at issue in *Hendricks*, "commitment under the Act does not implicate either of the two primary objectives of criminal punishment: retribution or deterrence." *Id.* at 361–62, 117 S.Ct. 2072. The Act is not retributive because it does not fix liability for prior criminal conduct. *Hendricks*, 521 U.S. at 362, 117 S.Ct. 2072. Instead, such conduct is used for evidentiary purposes, either to demonstrate that a "behavioral abnormality" exists or to support a finding of future dangerousness. *Id.* In addition, like the Kansas statute, the Act does not

---

11. In Texas, our constitution authorizes the Legislature to enact laws providing for commitment of certain individuals. *See* Tex. Const. art. I, § 15–a ("The Legislature may enact all laws necessary to provide for the trial, adjudication of insanity and commitment of persons of unsound mind ....").

make a criminal conviction a prerequisite for commitment—"persons absolved of criminal responsibility may nonetheless be subject to confinement under the Act." *Id.; see also* Tex. Health & Safety Code § 841.003(b)(1)(C); *Browning,* 113 S.W.3d at 861. This "absence of the necessary criminal responsibility suggests that the State is not seeking retribution for a past misdeed." *Hendricks,* 521 U.S. at 362, 117 S.Ct. 2072. "Thus, the fact that the Act may be 'tied to criminal activity' is 'insufficient to render the statut[e][sic] punitive.'" *Id.* (quoting *United States v. Ursery,* 518 U.S. 267, 292, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996)).

Additionally, the Act lacks the scienter requirement typically found in criminal statutes. In *Hendricks,* the Court recognized that "[t]he existence of a scienter requirement is customarily an important element in distinguishing criminal from civil statutes," and "[t]he absence of such a requirement ... is evidence that confinement under the statute is not intended to be retributive." 521 U.S. at 362, 117 S.Ct. 2072. In this case, the court of appeals held that "scienter sandwiches the second prong of the statute," which requires a finding that a person suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence. 123 S.W.3d at 843. But this was precisely the situation in *Hendricks,* and the Court in that case held that "no finding of scienter is required to commit an individual who is found to be a sexually violent predator; instead, the commitment determination is made based on a 'mental abnormality' or 'personality disorder' rather than on one's criminal intent." *Hendricks,* 521 U.S. at 362, 117 S.Ct. 2072; *see also id.* at 352, 117 S.Ct.

2072 (quoting Kansas statute which defined "sexually violent predator" as "any person who has been convicted of or charged with a sexually violent offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in the predatory acts of sexual violence"). The court of appeals incorrectly focused on the scienter required for a conviction of an underlying sexually violent offense, making an individual eligible for SVP commitment, rather than on whether scienter is required in the SVP commitment proceeding itself. *See, e.g., Rodriguez v. State,* 93 S.W.3d 60, 73 (Tex.Crim.App.2002) (sex offender registration statute did not require scienter, because "[a]lthough a culpable mental state may be required with respect to some of the underlying offenses, this does not answer the question of whether the registration statute requires a culpable mental state"); *Hubbart,* 81 Cal.Rptr.2d 492, 969 P.2d at 606–07 ("Even though prior criminal conduct was required for classification and commitment as a sexual predator, the statute did not 'affix culpability' or require a finding of 'criminal intent.'") (quoting *Hendricks,* 521 U.S. at 362, 117 S.Ct. 2072). We conclude that no finding of scienter is required to commit an individual found to be an SVP under the Texas Act.[12]

Like the Kansas statute at issue in *Hendricks,* it cannot be said that the Texas Act was intended to function as a deterrent. As in Kansas, "[t]hose persons committed under the Act are, by definition, suffering from a 'mental abnormality' or a 'personality disorder' that prevents them from exercising adequate control over their behavior. Such persons are therefore unlikely to be deterred by the threat of confine-

---

**12.** As more fully explained below, however, scienter would be required if an SVP were charged with violating a condition of commit-

ment, but this inquiry is separate from whether scienter is required to civilly commit an SVP.

ment." *Hendricks*, 521 U.S. at 362–63, 117 S.Ct. 2072. Moreover, the conditions surrounding confinement do not suggest a punitive purpose on the State's part. In *Hendricks*, the Court considered that individuals confined under the Kansas statute were not subject to the more restrictive conditions placed on state prisoners but instead experienced essentially the same conditions as any involuntarily committed patient in the state mental institution. *Id.* at 363, 117 S.Ct. 2072; *see also Browning*, 113 S.W.3d at 861 ("[W]e note that any incidental, marginal deterrent effect of Texas's outpatient-treatment and monitoring scheme will necessarily be less than any deterrence effected by Kansas's scheme of confinement."). In Texas, committed SVP's face conditions less restrictive than those in Kansas, where SVP's live in secure facilities within prison grounds. While some deterrence may result from the Texas Act, an incidental deterrent effect will not make the statute punitive: "[a]ny number of governmental programs might deter crime without imposing punishment." *Smith*, 538 U.S. at 102, 123 S.Ct. 1140. "To hold that the mere presence of a deterrent purpose renders such sanctions 'criminal' ... would severely undermine the Government's ability to engage in effective regulation...." *Hudson*, 522 U.S. at 105, 118 S.Ct. 488.

The court of appeals held that the Texas Act was punitive due, in part, to the differences between SVP commitment proceedings and "conventional" mental health commitment. 123 S.W.3d at 845–46. The court noted that a person committed via conventional commitment proceedings is confined for "at most" one year. *Id.* at 844; *see also* Tex. Health & Safety Code § 574.066(f). By contrast, an SVP is entitled only to biennial review of his or her status. 123 S.W.3d at 845; *see also* Tex. Health & Safety Code § 841.102. But this reasoning not only overlooks the SVP's

right to file an unauthorized petition for release at any time, *see* Tex. Health & Safety Code § 841.123, but the *Hendricks* holding that potentially indefinite commitment did not evidence punitive intent. *Hendricks*, 521 U.S. at 363, 117 S.Ct. 2072. "If, at any time, the confined person is adjudged 'safe to be at large,' he is statutorily entitled to immediate release." *Id.* at 364, 117 S.Ct. 2072 (quoting Kan. Stat. § 59–29a07). The Texas Act provides similar protection. *See* Tex. Health & Safety Code §§ 841.081, 841.121 (commitment ends when SVP's behavioral abnormality "has changed to the extent that the person is no longer likely to engage in a predatory act of sexual violence" and case manager must authorize petition for release at that time). Moreover, "[t]he Constitution does not require [a state] to write all of its civil commitment rules in a single statute or forbid it to write two separate statutes each covering somewhat different classes of committable individuals." *Hendricks*, 521 U.S. at 377, 117 S.Ct. 2072 (Breyer, J., dissenting). In Texas, the legislature explicitly found that "the existing involuntary commitment provisions" were inadequate to address the risk of repeated predatory behavior by SVP's. Tex. Health & Safety Code § 841.001. Thus, we cannot conclude that differences between SVP outpatient commitment and other mental health commitment necessarily establish a punitive purpose on the State's part.

#### d. Whether the Act Applies to Behavior Already a Crime

A statute that applies to behavior that is already a crime is more likely to be characterized as punitive. *See Kennedy*, 372 U.S. at 168, 83 S.Ct. 554; *see also Rodriguez*, 93 S.W.3d at 74 (noting that sex offender registration statute applied only to "defendants" who had "reportable convictions"). In this case, the Act defines "repeat sexually violent offender" to in-

clude both individuals convicted of sexually violent offenses and those adjudged not guilty by reason of insanity. Tex. Health & Safety Code § 841.003(b)(1)(A), (C). Because the Act does not categorically apply only to convicted individuals, this factor does not weigh in favor of finding that the Act is punitive.

### e. Rational Connection to Nonpunitive Purpose

The Act's rational connection to a nonpunitive purpose is a "most significant" factor in determining whether the statute's effects are punitive or civil. *Ursery*, 518 U.S. at 290, 116 S.Ct. 2135. The United States Supreme Court has "repeatedly held that the Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest." *Salerno*, 481 U.S. at 748, 107 S.Ct. 2095. It has "also held that the government may detain mentally unstable individuals who present a danger to the public." *Id.* at 748–49, 107 S.Ct. 2095. Thus, the State's interest is twofold: "The state has a legitimate interest under its *parens patriae* powers in providing care to its citizens who are unable because of emotional disorders to care for themselves; the state also has authority under its police power to protect the community from the dangerous tendencies of some who are mentally ill." *Addington*, 441 U.S. at 426, 99 S.Ct. 1804. Our Court has acknowledged these dual interests. *See State v. Turner*, 556 S.W.2d 563, 566 (Tex.1977) ("The State, as parens patriae undertakes the beneficent task of treating the mentally ill, and under its police power protects the public from harm. These are valid, necessary state objectives which should not be thwarted. . . .").

The Act furthers these interests. In *Hendricks*, the Supreme Court recognized that Kansas's "overriding concern" was the "continued 'segregation of sexually violent offenders,'" a purpose "consistent with [the] conclusion that the Act establishes civil proceedings, especially when that concern is coupled with the State's ancillary goal of providing treatment to those offenders, if such is possible." *Hendricks*, 521 U.S. at 366, 117 S.Ct. 2072 (quoting *In re Hendricks*, 259 Kan. 246, 912 P.2d 129, 136 (1996)). In Texas, the legislature found that "a small but extremely dangerous group of sexually violent predators exists," predators whose behavioral abnormalities were "not amenable to traditional mental illness treatment modalities" and were "likely to engage in repeated predatory acts of sexual violence." Tex. Health & Safety Code § 841.001. Thus, the Act is rationally connected to its twin goals of "long-term supervision and treatment." *Id.*

### f. Excessiveness

Finally, we examine whether the Act "appears excessive in relation" to its purpose. *Kennedy*, 372 U.S. at 169, 83 S.Ct. 554. The court of appeals held that the Act failed the excessiveness inquiry because the "100-plus disabilities [in the Treatment and Supervision Contract] are not tailored to [Fisher's] individual needs but rather represent a net cast to the broadest reach of possible variables." 123 S.W.3d at 846. The United States Supreme Court did not discuss the excessiveness factor in deciding that the Kansas SVP Act was civil. *See Hendricks*, 521 U.S. at 361–71, 117 S.Ct. 2072. *But see id.* at 394, 117 S.Ct. 2072 (Breyer, J., dissenting) ("I believe the Act . . . is excessive in relation to any alternative purpose assigned."). In a different case, however, the Supreme Court noted:

The excessiveness inquiry . . . is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy. The question is whether the

regulatory means chosen are reasonable in light of the nonpunitive objective. The Act meets this standard.

*Smith v. Doe,* 538 U.S. at 105, 123 S.Ct. 1140. The Court has clarified that this factor alone should not be dispositive. *Hudson,* 522 U.S. at 101, 118 S.Ct. 488.

While the Texas Act is strikingly similar to the Kansas statute upheld in *Hendricks,* there is a notable difference. The Texas SVP scheme is unique in that it provides for outpatient commitment and, perhaps consequently, imposes severe criminal penalties for violating a condition of confinement. We must determine whether the criminal penalty provision sufficiently tips the statute into the punitive realm. The statute at issue in *Hendricks* required "secure" confinement and "'incarceration against one's will.'" *Hendricks,* 521 U.S. at 379, 117 S.Ct. 2072 (Breyer, J., dissenting) (quoting *In re Gault,* 387 U.S. 1, 50, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967)) (citing record testimony demonstrating that confinement took place in the psychiatric wing of the prison hospital where those whom the Act confined and ordinary prisoners were treated alike); *see also Seling,* 531 U.S. at 259, 121 S.Ct. 727 (detailing Washington SVP scheme in which SVP's were committed to a "Center, located wholly within the perimeter of a larger Department of Corrections (DOC) facility, [and which] relied on the DOC for a host of essential services, including library services, medical care, food, and security"). Indeed, according to one report, at least fourteen of the seventeen states with SVP civil commitment procedures mandate commitment in a secure facility. *See* Washington State Institute for Public Policy (2004), State by State Comparison of the Civil Commitment of Sexually Violent Predators, at http://www.tdh. state.tx.us/ hcqs /plc/csot—svp chart.doc (last visited May 18, 2005 and available in Clerk of Court's file); *see also In re Det. of Garren,* 620 N.W.2d at 281–82.

By contrast, the Texas Act permits the SVP to live at large in the community. Should the SVP violate one of the commitment requirements, however, the offense is a third-degree felony.[13] Tex. Health & Safety Code § 841.085. Thus, the Texas Act appears at once less restrictive and potentially more restrictive than its out-of-state counterparts. On the whole, however, the freedom from confinement outweighs the criminal sanction imposed for a failure to obey the commitment conditions. For example, in Texas, unlike other states, many civilly committed SVP's are permitted to live at home with their families. *See* Walter J. Meyer, III et al., *Outpatient Civil Commitment in Texas for Management and Treatment of Sexually Violent Predators: A Preliminary Report,* 47(4) Int'l J. Offender Therapy & Comp. Criminology 396, 401 (2003). Moreover, the United States Supreme Court has never held that the imposition of criminal penalties for violating a civil regulatory scheme ipso facto renders an act punitive, rather than civil. *See, e.g., Smith,* 538 U.S. at 90, 105–06 (holding that Alaska Sex Offender Registration Act was civil even though a knowing failure to comply would subject the offender to criminal prosecution); *Hawker v. New York,* 170 U.S. 189, 192–94, 200, 18 S.Ct. 573, 42 L.Ed. 1002 (1898) (holding that New York statute prohibiting felons from obtaining licenses to practice medicine did not vio-

---

**13.** This criminal penalty is separate from the initial commitment proceedings. *See, e.g., Smith v. Doe,* 538 U.S. 84, 101–02, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003) (noting that "[a] sex offender who fails to comply with the reporting requirement may be subjected to a criminal prosecution for that failure, but any prosecution is a proceeding separate from the individual's original offense").

late ex post facto clause, despite criminal penalties imposed for failure to comply: "such legislation is not to be regarded as a mere imposition of additional penalty, but as prescribing the qualifications for the duties to be discharged and the position to be filled"). "[W]hile [a Texas SVP's] liberty is indeed restrained, the intrusion is far less restrictive than if he were confined in a secure facility in Kansas. And yet the Supreme Court found commitment under the Kansas act to be civil in nature." *Browning,* 113 S.W.3d at 859 (citing *Hendricks,* 521 U.S. at 360–69, 117 S.Ct. 2072). *But see Commonwealth v. Williams,* 574 Pa. 487, 832 A.2d 962, 985–86 (2003) (holding that criminal penalties imposed for violating Pennsylvania's Registration of Sexual Offenders Act were unconstitutionally punitive). We conclude that the criminal penalties attaching to a violation of a commitment requirement, when considered in relation to the statutory purpose and alongside the other *Kennedy* factors, do not make the commitment scheme punitive. *See, e.g., Ursery,* 518 U.S. at 290, 116 S.Ct. 2135 (deeming law nonpunitive despite "punitive aspects").

■ Fisher has not provided "the clearest proof" that the statute's effects are punitive. Instead, taken together, *Kennedy's* "useful guideposts" point to a conclusion that a commitment proceeding under the Act is a civil matter. Accordingly, we now turn to Fisher's contention that due process guaranteed him the right to be competent at trial.

## B

### Competence

The court of appeals held that the statute was punitive and, therefore, Fisher

had the right to be competent at trial. 123 S.W.3d at 850. Because the Act is civil, however, an SVP who may be incompetent to stand trial on criminal charges can nonetheless be civilly committed pursuant to chapter 841. *See In re Commitment of Martinez,* 98 S.W.3d 373, 376 (Tex.App.-Beaumont 2003, pet. denied) ("Due process does not require a separate competency hearing in a civil commitment proceeding under Chapter 841."); *see also In re Detention of Cubbage,* 671 N.W.2d 442, 447 (Iowa 2003) (concluding that alleged SVP "does not have a fundamental right to be competent during his SVPA proceedings"); *State v. Kinder,* 129 S.W.3d 5, 10 (Mo.Ct. App.2003) ("Subjecting a suspected sexually violent predator to a statutory sexually violent predator determination, regardless of competency, is not an unconstitutional deprivation of liberty."). This comports with legislative intent, as the legislature contemplated that not all alleged SVP's would be mentally competent. The definition of a sexually violent offender—a necessary prerequisite to an SVP determination—includes someone who "is adjudged not guilty by reason of insanity of a sexually violent offense." [14] Tex. Health & Safety Code § 841.003(b)(1)(C); *see also id.* §§ 841.003(b)(2)(B), 841.081 (commitment begins on date SVP is released from correction facility or is *"discharge[d] from a state hospital"*) (emphasis added). Moreover, this result is consistent with *Hendricks* the Kansas statute applied to persons who were charged with a sexually violent offense but found incompetent to stand trial. *Hendricks,* 521 U.S. at 352, 117 S.Ct. 2072. Indeed, "[t]he very nature of civil commitments is that they commit for treatment those who pose a danger to

---

14. For this reason, we also disagree with the court of appeals' holding that "multiple prior sexually violent convictions are a fundamental and jurisdictional requirement of the act." 123 S.W.3d at 841 (emphasis added).

themselves or others because they suffer from a mental disease or defect and are unable to comprehend reality or to respond to it rationally." *Kinder*, 129 S.W.3d at 8. Because "involuntary commitment does not itself trigger the entire range of criminal procedural protections," *Allen*, 478 U.S. at 372, 106 S.Ct. 2988, we conclude that Fisher was not entitled to a competency determination prior to his SVP trial.

We note, however, that while the initial commitment proceeding is civil, a prosecution for violating a condition of commitment is undoubtedly criminal. *See* Tex. Health & Safety Code § 841.085. In such a proceeding, Fisher would be entitled to the full array of rights available to all criminal defendants. Thus, if Fisher were charged with such a violation, his competency could be determined at that time. *See, e.g.,* Tex. Code Crim. Proc. ch. 46B. Moreover, the State concedes that, at any such criminal trial, the State would have to prove scienter on the SVP's part. *See, e.g.,* Tex. Pen.Code § 6.02. If, as he argues, Fisher's incompetence dooms him to violate the court's commitment order, Fisher may raise lack of scienter as a defense in any such criminal proceeding.

## C

### Fifth Amendment

■ The self-incrimination clause of the Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The United States Supreme Court "has long held that the privilege against self-incrimination 'not

only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.' " *Allen*, 478 U.S. at 368, 106 S.Ct. 2988 (quoting *Minnesota v. Murphy*, 465 U.S. 420, 426, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984)).

Before Fisher testified, his attorney objected on the basis of Fisher's privilege against self-incrimination. Although the trial court overruled the objection, the court noted that, if Fisher were to blurt out some subsequent unlawful act he committed, the trial court would either excise the testimony from the record or grant Fisher immunity. Fisher did not object to any individual question. On appeal, Fisher points to no question that subjected him to future criminal liability nor to any incriminating testimony on his part. Fisher's brief complains that Fisher was required to give a deposition, but the record contains no such deposition. We hold that Fisher's Fifth Amendment challenge lacks merit.

## D

### Vagueness

■ Fisher did not preserve a vagueness challenge in the trial court. The State contends that Fisher waived the point; Fisher responds that facial constitutional challenges need not be preserved at the trial court level, and he purports to assert such a challenge. Assuming without deciding that Fisher may do so,[15] we

---

15. We have recognized that "the general rule against facial vagueness challenges is relaxed when the assertedly vague statute has the potential to affect First Amendment freedoms." *Comm'n for Lawyer Discipline v. Ben-*

*ton*, 980 S.W.2d 425, 438 (Tex.1998). Although Fisher asserts that "First Amendment rights are implicated" in his vagueness challenge, his three vagueness complaints do not

address his facial challenge to the Act. To prevail on his facial vagueness challenge, Fisher bears the heavy burden of showing that the Act is unconstitutional in every possible application. *See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494–95, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); *Tex. Boll Weevil Eradication Found., Inc. v. Lewellen,* 952 S.W.2d 454, 461 n. 5 (Tex.1997). "Although passing on the validity of a law wholesale may be efficient in the abstract, any gain is often offset by losing the lessons taught by the particular, to which common law method normally looks. Facial adjudication carries too much promise of 'premature interpretation[ ] of statutes' on the basis of factually bare-bones records." *Sabri v. United States,* 541 U.S. 600, 608–609, 124 S.Ct. 1941, 158 L.Ed.2d 891 (2004) (quoting *United States v. Raines,* 362 U.S. 17, 22, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960)).

■ A statute prohibiting conduct that is not sufficiently defined is void for vagueness. *See Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Comm'n for Lawyer Discipline v. Benton,* 980 S.W.2d 425, 437 (Tex.1998). Fisher contends that the Act is void for vagueness, for three reasons. First, he complains that, unlike other states' SVP statutes, *see, e.g.,* Ark.Code Ann. §§ 12–12–917, 12–12–918, the Act does not individualize treatment; that is, "no risk levels are assigned to the SVPs so that levels of restrictions and treatment may be adjusted according to individual needs and capacity to comply with requirements." While Fisher is correct that the Act does not specify that risk levels be

assigned, the Act gives the trial court leeway to fashion restrictions tailored to the particular SVP facing commitment. *See, e.g.,* Tex. Health & Safety Code § 841.082(a) (requiring judge to impose on SVP any requirements "necessary to ensure the person's compliance with treatment and supervision and to protect the community"). Thus, we cannot agree that the absence of risk levels prohibits individualized treatment and renders the Act unconstitutionally vague.

■ Second, Fisher asserts that the Act is vague because it predicates commitment on a "behavioral abnormality" rather than a "medically recognized and diagnosable mental illness." The Texas legislature defined behavioral abnormality as:

a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person.

Tex. Health & Safety Code § 841.002(2). This definition is virtually identical to the Kansas statute's definition of "mental abnormality," a definition that the United States Supreme Court has held "satisfies 'substantive' due process requirements." [16] *Hendricks,* 521 U.S. at 356, 117 S.Ct. 2072; *see also* Kan. Stat. Ann. § 59–29a02(b) (defining "mental abnormality" as a "congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others"); *Beasley v. Molett,* 95 S.W.3d 590, 597 (Tex.App.-Beaumont 2002,

---

appear to involve speech or conduct protected by the First Amendment.

**16.** In fact, eight justices agreed that the definition of "mental abnormality" in the Kansas

act satisfied substantive due process requirements. *See Hendricks,* 521 U.S. at 373, 117 S.Ct. 2072 (Breyer, J., dissenting).

pet. denied) (holding that the Texas Act's "behavioral abnormality" requirement was "virtually the same" as the "mental abnormality" definition examined in *Hendricks* ). Moreover, the United States Supreme Court has "never required state legislatures to adopt any particular nomenclature in drafting civil commitment statutes. Rather, [it has] traditionally left to legislators the task of defining terms of a medical nature that have legal significance." *Hendricks,* 521 U.S. at 359, 117 S.Ct. 2072. We conclude that Fisher has failed to demonstrate that the Act's behavioral abnormality definition is unconstitutionally vague in every application.

█ Finally, Fisher contends that the provisions of his "Treatment and Supervision Contract" appended to the judgment are unconstitutionally vague, allowing arbitrary enforcement. The Treatment and Supervision Contract proscribes a broad spectrum of conduct, some of it apparently reasonable (Fisher cannot contact his victims and must live in a prescribed location), some of it less so (Fisher must not "walk or ride around aimlessly" or "sit and watch people"). This challenge, however, is not that the statute is unconstitutional on its face, but rather that the statute *as applied to Fisher* via the conditions of his commitment contract—is unconstitutionally vague.[17] Other than his competency and fifth amendment issues, Fisher did not raise any constitutional challenges in the trial court. As a rule, a claim, including a constitutional claim, must have been asserted in the trial court in order to be raised on appeal, so that the trial court has the opportunity to rule on the issue. *See* Tex.R.App. P. 33; *Tex. Dep't of Protective & Regulatory Servs. v. Sherry,* 46 S.W.3d 857, 861 (Tex.2001). Had Fisher so re-

quested, it is possible that the trial court would have modified or removed some of the contract conditions of which he now complains. Because Fisher did not assert this claim in the trial court, we do not reach Fisher's as-applied vagueness challenge.

## IV

### Conclusion

We conclude that the Act is civil and that, therefore, due process does not require, as in a criminal proceeding, that Fisher be competent to stand trial. We also conclude that Fisher's fifth amendment and facial vagueness challenges lack merit. We reverse the court of appeals' judgment and render judgment civilly committing Fisher to supervision and treatment as outlined in the trial court's final judgment and order of commitment. *See* Tex.R.App. P. 60.2(c).

Justice JOHNSON did not participate in the decision.

---

**17.** Under an "as applied" challenge, the challenging party contends that the statute, although generally constitutional, operates un-

constitutionally as to him or her because of the challenging party's particular circumstances. *Lewellen,* 952 S.W.2d at 461 n. 5.