In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-07-062 CV


____________________



IN RE COMMITMENT OF WESLEY MILLER






On Appeal from the 359th District Court


Montgomery County, Texas


Trial Cause No. 06-02-01871 CV






 OPINION


 In 2006, a jury determined that Wesley Miller was a sexually violent predator. See
Tex. Health & Safety Code Ann. § 841.003 (Vernon 2003). Miller appeals from the trial
court's judgment and order of civil commitment. Among other issues, he challenges the
constitutionality of amendments to the Texas Sexually Violent Predator Act ("SVPA" or
"Act") that allow a crime "based on sexually motivated conduct" to serve as a predicate
offense. See Tex. Health & Safety Code Ann. § 841.002(7-a), (8)(D) (Vernon Supp.
2007). We affirm.


I. Statute and Its Amendments


 The Act (1) provides for the involuntary civil commitment of an offender to outpatient
treatment and supervision if the offender is found to be a sexually violent predator ("SVP").
See id. § 841.081. A sexually violent predator, by statutory definition, is a person who "(1)
is a repeat sexually violent offender; and (2) suffers from a behavioral abnormality that
makes the person likely to engage in a predatory act of sexual violence." Tex. Health &
Safety Code Ann. § 841.003(a) (Vernon 2003) (emphasis added). A repeat sexually violent
offender is one who has been convicted of more than one sexually violent offense and a
sentence is imposed for at least one of the offenses. Id. § 841.003(b). (2)

 Prior to 2005, the qualifying predicate offenses that could lead to commitment under
the Act included, among others, sexual assault (Penal Code section 22.011) and aggravated
sexual assault (Penal Code section 22.021). Act of May 30, 1999, 76th Leg., R.S., ch. 1188
§ 4.01, sec. 841.002(A), 1999 Tex. Gen. Laws 4143, 4144 (current version at Tex. Health
& Safety Code Ann. § 841.002 (8)(A) (Vernon Supp. 2007)); see Tex. Pen. Code Ann.
§§ 22.011, 22.021 (Vernon 2003 & Supp. 2007). In 2005, the Texas legislature expanded
the list of qualifying offenses to include murders and capital murders that are "determined
beyond a reasonable doubt to have been based on sexually motivated conduct." Act of May
23, 2005, 79th Leg., R.S., ch. 849 § 1, sec. 841.002(8)(D), 2005 Tex. Gen. Laws 2890, 2891
(amendment codified at Tex. Health & Safety Code Ann. § 841.002 (8)(D) (Vernon
Supp. 2007)); see Tex. Pen. Code Ann. §§ 19.02, 19.03 (Vernon 2003 & Supp. 2007). 

 The amendments further define "sexually motivated conduct" as "any conduct
involving the intent to arouse or gratify the sexual desire of any person immediately before,
during, or immediately after the commission of an offense." 2005 Tex. Gen. Laws at 2890
(amendment codified at Tex. Health & Safety Code Ann. § 841.002 (7-a) (Vernon Supp.
2007)). One of the predicate offenses for Miller's commitment was a murder conviction that
the State alleged had been based on sexually motivated conduct. In his appeal, Miller
challenges the constitutionality of the 2005 amendments.

II. Background


 In 1982, a jury convicted Miller for murdering Retha Stratton and assessed his
punishment at twenty-five years in prison. As he neared the end of his prison term, the State
filed a petition to commit him under the Act. In the SVP proceeding, the State alleged that
the two required predicate offenses were Miller's conviction of burglary with intent to
commit rape and his murder conviction.

 In this case, the State undertook the burden of proving during Miller's civil
commitment proceeding that Stratton's murder had been sexually motivated. At Miller's
civil commitment trial, the State introduced evidence relevant to that issue. That evidence
included Miller's statement that he gave to Detective Dennis Timmons on January 23, 1982,
regarding Retha Stratton's murder. Timmons was present when Miller signed the statement.
Miller's statement explained events preceding the murder. Miller stated that just prior to the
murder, Stratton "started coming on to me and I cooperated until she backed off so I
stopped." (3)
 Miller then explained that Stratton "started coming on to me again and I did not
stop this time when she backed off and we started fighting." At that point, Miller implied 
he believed that Stratton reached for a knife, the knife fell onto the floor, and he picked the
knife up and stabbed her. 

 At Miller's commitment trial, Timmons described the homicide scene at Retha
Stratton's home. Timmons testified that Stratton had been stabbed repeatedly in the left
breast, the knife was left embedded in her chest, both breasts were exposed, and her
underpants had been stuffed into her mouth. 



 

 At his commitment trial, Miller testified that he was sexually attracted to Stratton but 
he was not interested in marriage. He agreed that his goal the evening of the murder was
sexual intercourse and that he was interested only in sex. 

 Three expert witnesses testified about the sexually motivated conduct associated with
Stratton's murder: Dr. Jack Price, a psychologist who is board certified in forensic
psychology and neuropsychology; Dr. Michael Arambula, a physician who specializes in
psychiatry, with a subspecialty in forensic psychiatry; and Dr. Jason Dunham, a forensic
psychologist. 

 Dr. Price viewed the crime scene photographs in evaluating whether the murder of 
Retha Stratton was based on sexually motivated conduct. He testified: 

 I can see no other reason other than something related to sex. That the victim
is unclothed from the breasts down. Her panties are stuffed in her mouth. The
stab wounds concentrate on the breast. She is placed in a position with her
legs spread apart. There's just no other explanation.

Dr. Price also reviewed an autopsy photograph and explained its significance: 

 Well, as opposed to the other photograph, where the blood covered up the
exact stab wounds, here you can see them very clearly and that they
concentrate on the breast, not in the center of the chest, not all over . . . they
were focused-the attention was on the breast. That indicates sexual thinking
on the part of the offender. It-that's his focus. 

 Dr. Arambula testified that "[s]exually motivated conduct was a part of the
murder. . . ." Dr. Armabula noted that Miller and Stratton were "kissing and petting. That's
sexually stimulating . . . . So that element is already there." Dr. Arambula further explained
that sexual motivation was indicated by behavioral symbolism present at the murder scene. 
The elements considered important by Dr. Arambula were the removal of Stratton's clothing,
the mutilation cuts, the knife left in Stratton's chest as a phallic symbol, the positioning of
her body, and the panties stuffed into her mouth.

 Miller called Dr. Dunham to contradict the testimony of other witnesses regarding the
sexually motivated nature of Stratton's murder. Dr. Dunham testified that he did not "see
how someone can say for certain what happened there and what was the motivation behind
that." Significant to Dr. Dunham was the absence of any indication of rape and the absence
of semen. If sexual motivation had been the reason for the murder, Dr. Dunham doubted that
Miller would have been able to resist the temptation to rape Stratton. As to any sexual
symbolism present at the murder scene, Dr. Dunham noted that such interpretations were not
based on "a hard science."

III. Miller's Issues


 In issue one, Miller asserts that the Act, as amended, is punitive and therefore
unconstitutional. Issue two asserts that his civil commitment proceeding is barred by
constitutional prohibitions against double jeopardy. Issue three asserts that the amended Act
constitutes an unlawful bill of attainder. Issue four contends that the Act, as amended, is
void for vagueness. Issues five and six challenge the adequacy of the trial court's jury
charge. Issue seven argues that the doctrine of res judicata bars his commitment proceedings. 
Issue eight asserts that the trial court inappropriately imposed a child safety zone in its
commitment order. 

IV. Is the Act Punitive? 


 Miller argues in issue one that the amended Act is punitive and, thus, unconstitutional
because the commitment proceedings brought against him violated his due process rights by
not providing him with the protections of criminal procedure. In arguing the Act is punitive,
Miller contends that the amended statute seeks retribution and requires a retroactive
determination of why he committed the murder.

 The amendments allow murder and capital murder to serve as predicate offenses for
commitment if they are "determined beyond a reasonable doubt to have been based on
sexually motivated conduct[.]" Tex. Health & Safety Code Ann. § 841.002 (8)(D). The
determination may be made "during the guilt or innocence phase or the punishment phase for
the offense . . . or subsequently during a civil commitment proceeding . . . ." Id. In this case,
the State sought to prove during Miller's civil commitment hearing that the murder was
sexually motivated.

 Miller does not argue that any difference between the Texas constitution and the
federal constitution is material to his case. See In re Commitment of Fisher, 164 S.W.3d 637,
645 (Tex. 2005). His constitutional arguments are based primarily on cases decided by the
United States Supreme Court. Because material differences are not apparent, "we limit our
analysis to the United States Constitution and assume that its concerns are congruent with
those of the Texas Constitution." Id. Our analysis of a statute's constitutionality "begins
with a presumption of validity." Id. In Fisher, the Texas Supreme Court addressed the
constitutionality of a prior version of the SVP statute and held that it was not punitive. Id.
at 653. In determining whether commitment proceedings under the statute violated Miller's
due process rights, we first must determine whether the amendments have caused the Act to
become punitive. See id. 

 Under the Act, the Texas Supreme Court held that commitment proceedings were civil
rather than criminal. Id. at 639, 647 (relying on Kansas v. Hendricks, 521 U.S. 346, 117
S.Ct. 2072, 138 L.Ed.2d 501 (1997)). The Fisher Court further noted that courts in fourteen
states had determined that their SVP statutes were civil. Id. at 646. (4) At least two other states,
New Hampshire and New York, have enacted SVP statutes since Fisher was decided. See
N.H. Rev. Stat. Ann. §§ 135-E:1- :23 (LexisNexis 2008) (enacted in 2006); N.Y. Mental
Hyg. Law §§ 10.01-.17 (LexisNexis 2008) (enacted in 2007). Further, the United States
Congress has as well. 18 U.S.C. § 4248 (enacted in 2006); see United States v. Carta, 503
F.Supp. 2d 405, 407 (D. Mass. 2007). 

 In determining that proceedings under the Act were civil, the Fisher Court applied the
"intent-effects" test. Fisher, 164 S.W.3d at 647 (citing Moore v. Avoyelles Corr. Ctr., 253
F.3d 870, 872 (5th Cir. 2001)). Under this test, the appellate court first examines legislative
intent and then reviews the statute's effects. Id. The court rejects the legislative intent to
establish a civil statute "only where a party challenging the Act provides 'the clearest proof'
that the statutory scheme is so punitive in either purpose or effect as to negate the State's
intention." Id. (quoting Hendricks, 521 U.S. at 361, 117 S.Ct. 2072). After determining that
the legislature intended for the Act to be civil, the Fisher Court analyzed the Act's purposes
and effects pursuant to the Kennedy factors. Id. at 647-48 (citing Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963)). Fisher noted that the
Kennedy factors (5) are "'neither exhaustive nor dispositive[.]'" Id. at 647 (quoting United
States v. Ward, 448 U.S. 242, 249, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980)). In addition, the
Fisher Court noted that the Kennedy factors "'may often point in differing directions' and
'must be considered in relation to the statute on its face.'" Id. at 648 (quoting Kennedy, 372
U.S. at 169). After completing its Kennedy examination of the Act's effects, the Texas
Supreme Court concluded that the Act was civil in nature. Id. at 653.

 Scienter and retribution were two of the seven factors discussed in Kennedy. 372 U.S.
at 168-69. Miller focuses on these two factors to support his argument that the amendments
make the SVP statute punitive. See id. 

 The party challenging the statute has the burden to establish the statute is
unconstitutional. Walker v. Gutierrez, 111 S.W.3d 56, 66 (Tex. 2003); Gen. Servs. Comm'n
v. Little-Tex Insulation Co., 39 S.W.3d 591, 598 (Tex. 2001). When possible, we are to
uphold the statute and "interpret legislative enactments in a manner to avoid constitutional
infirmities." Barshop v. Medina County Underground Water Conservation Dist., 925
S.W.2d 618, 629 (Tex. 1996); see Little-Tex, 39 S.W.3d at 598. 

Scienter


 As to his motives to commit the murder, Miller argues that the SVPA amendments
"single out those who committed their crime in a specific mindset, with intent of sexual
gratification." He further argues that "as applied to any candidate being sued based on a
murder or capital murder conviction," commitment is allowed only "with a finding of
scienter, tipping the scales in favor of a finding that the SVP Act is intended as punishment."

 Initially, we note that under Kennedy, we are to consider whether the "sanction,"
(involuntary commitment) "comes into play only on a finding of scienter[.]" See Kennedy,
372 U.S. at 168 (emphasis added). In Fisher, the Texas Supreme Court found that the
commitment procedure existing before the amendments involved no finding of scienter, and
those procedures still apply for commitments based on predicate offenses other than sexually
motivated murder. See 164 S.W.3d at 649. Thus, the statute, as amended, would not always
operate to require scienter-type findings in all SVP cases. Cf. Capps v. State, No. 01-07-00298-CR, 2008 WL 963139, at *5 (Tex. App.-Houston [1st Dist.] Apr. 10, 2008, no pet.
h.) (not yet released for publication) ("While it may be true that appellant's culpable mental
state was considered by the court in rendering its final judgment of disbarment, nothing in
the rules provides for disbarment or restitution for only specific violations that involve an
element of scienter.").

 Texas is not alone in defining "sexually violent offenses" to encompass those that are
"sexually motivated." The SVP statutes of several states provide that certain "sexually
motivated offenses" are considered "sexually violent offenses" for commitment purposes. 
These states include:


 Arizona (murder, assault, false imprisonment, and first-degree burglary,
among others); 
 Florida (any criminal act determined to be sexually motivated); 
 Illinois (first-degree murder); 
 Iowa (any criminal act determined to be sexually motivated); 

 Kansas (any criminal act determined to be sexually motivated); 

 Washington (murder, assault, kidnapping, first- degree burglary, among
others). (6)


All of the above states, except Illinois, allow the "sexually motivated" determination to be
made at the commitment proceeding. (7) By contrast, Illinois allows "the agency with
jurisdiction" to determine if a first-degree murder was sexually motivated. 725 Ill. Comp.
Stat. Ann. § 207/5 (e)(2) (LexisNexis 2008). 

 In this case, the State alleged that Miller committed two predicate offenses. The first
was Stratton's murder, which the State alleged was "sexually motivated." Miller's other
predicate offense was burglary of a habitation with intent to commit rape, an offense to
which he pled guilty. Other states with similar statutes require only one predicate offense. (8) 
Thus, under the SVP statutes of other states, the single conviction of burglary with intent to
rape could have been sufficient to allow those states to seek the person's commitment. 

 In finding the Kansas SVP statute constitutional, the Hendricks Court explained the
evidentiary nature of prior commitments. Hendricks, 521 U.S. at 357 (finding that the statute
"requires evidence of past sexually violent behavior and a present mental condition that
creates a likelihood of such conduct in the future if the person is not incapacitated."). 
Hendricks, however, "did not rely on the requirement of a prior conviction. Rather, it noted
that the concurrent presence of a mental abnormality and dangerousness was constitutionally
sufficient." Carta, 503 F.Supp. 2d at 409 (citing Hendricks, 521 U.S. at 358).

 In Hendricks, the Supreme Court approved a statutory scheme that allowed a
commitment of an individual based on one prior charge or conviction of a sexually violent
offense when that person suffered from a mental abnormality or personality disorder that
made him likely to engage in predatory acts of sexual violence. Hendricks, 521 U.S. at 350-52. One of Miller's convictions was for burglary with intent to commit rape, and with
respect to this conviction the jury was not required to and did not retrospectively determine
that it was a sexually motivated crime. By requiring two prior predicate offenses, Texas's
SVP statutory scheme is more restrictive than the Kansas statute approved as constitutional
in Hendricks. In addition, Texas's amended Act restricts civil commitments to those persons
who suffer a behavioral abnormality. (9) Tex. Health & Safety Code Ann. § 841.003(a)(2). 
As a result, regardless of the nature of the person's prior offenses, the amended Act limits
involuntary civil commitments to persons suffering from a volitional impairment that renders 
them dangerous beyond their control. See Hendricks, 521 U.S. at 358.

 A party challenging the State's intent to establish a civil statute must provide "'the
clearest proof'" that the statute's purpose or effect is so punitive that the State's intention is
negated. Fisher, 164 S.W.3d at 647 (quoting Hendricks, 521 U.S. at 361). Miller has not
met this burden. In view of the evidentiary nature of predicate offenses, the absence of a
general scienter requirement in the Texas statute, and the restrictive nature of the Texas
statute, we are not persuaded by Miller's scienter argument that the amended Act is punitive. 

 We now consider Miller's argument that the legislature passed the amendments to
further punish him for prior crimes. 

Retribution


 Miller argues that the testimony and statements presented on behalf of Senate Bill
912 (10) (an Act Relating to the Civil Commitment of Sexually Violent Predators) portrayed the
amendments to the Texas Act "as measures to compensate for perceived past weaknesses in
the Texas criminal justice system as a whole and in the prosecutions of Respondent Wesley
Miller in particular." Miller points to comments made by State Senator Florence Shapiro
during a hearing before the Senate Committee on Criminal Affairs on April 12, 2005, and
argues: 

 State Senator Florence Shapiro, the bill's sponsor, speculated that, in
the past, many offenders were charged with a greater offense not contemplated
by the original SVP Act rather than "the underlying sex offense that motivated
the inmate," and that "many of these offenders were convicted under the
mandatory sentencing laws of the 70s and 80s and they are now being released
from TDCJ on a flat discharge.


 Senator Shapiro was the bill's sponsor, and she made the statements Miller attributes
to her. But, she also made a number of other comments relating to proposed amendments
to the Act, such as those addressing: 1) the costs of global-positioning tracking used in the
program, 2) the suspension of commitment under certain circumstances, and 3) the biennial
examinations required under the Act. See Tex. Health & Safety Code Ann. §§ 841.084,
.101, .150 (Vernon 2003 & Supp. 2007).

 The audio-taped transcript of the hearing also contains testimony from certain
witnesses: Lisa Gabbert, Rona Stratton Smith, Wichita County District Attorney Barry
Macha, Tarrant County Assistant District Attorney Mitch Poe, and Gina DeBottis, chief
prosecutor for the Special Prosecution Unit. Gabbert and Smith were, respectively, the friend
and sister of Retha Stratton. Macha prosecuted Miller on the previously discussed charge
of burglary with intent to commit rape, and Poe represented the district attorney's office that
prosecuted Miller for Stratton's murder. While all four of these witnesses referred to Miller, 
they did so in the context of explaining that Miller's murder conviction was an example of
what the proposed amendments would enable the statute to reach. 

 Also included on the audio-tape are comments from the committee chairman, John
Whitmire, and a committee member, Tommy Williams. Whitmire noted that the amendments
would cover Miller and others like him. In addressing questions to witness DeBottis,
Williams indicated that he did not want a lack of funding to prevent offenders such as Miller
and others from being candidates for civil commitment. DeBottis, the State's prosecutor in
SVP cases, testified that she considered the funding to be adequate.

 Having reviewed the entire transcript of Senate Bill 912's hearing, we conclude that
the witnesses used Miller's crime as an example of an offense that could be considered under
the proposed amendments in an SVP commitment proceeding. (11) Thus, we further conclude
that Miller has failed to provide "'the clearest proof"' that the amendments have made the
Act so retributive and punitive "'in either purpose or effect.'" Fisher, 164 S.W.3d at 647
(quoting Hendricks, 521 U.S. at 361). Consequently, Miller has not met his burden to
overcome the State's evidence that the legislature intended the Act's nature to be civil. See
Hendricks, 521 U.S. at 361; Fisher, 164 S.W.3d at 647. In view of the foregoing, we decline
to infer "retribution" from "example" testimony and decline to find that the amendments'
legislative history causes them to be punitive and violative of Miller's due process rights. 
We overrule issue one.


V. Other Constitutional Arguments: 


 Double Jeopardy, Bill of Attainder, and Vagueness
 

 In issues two, three, and four, Miller argues the amended Act violates his
constitutional rights. Issue two asserts that re-litigation of Retha Stratton's murder was
prohibited by the double jeopardy clause. Issue three argues the amendments are prohibited
bills of attainder. (12) Issue four contends the amended Act is void for vagueness. 

Double Jeopardy
 

 The Double Jeopardy Clause (13) is "generally understood to preclude a second
prosecution for the same offense[.]" Hendricks, 521 U.S. at 369. In addition, it prohibits the
state from "'punishing twice, or attempting a second time to punish criminally, for the same
offense.'" Id. (quoting Witte v. United States, 515 U.S. 389, 396, 115 S. Ct. 2199, 132
L.Ed.2d 351(1995)). But, initiation of civil commitment proceedings "does not constitute
a second prosecution." Id. at 368. Just as important is that a commitment under an SVP
statute "is not tantamount to punishment[.]" Id. ("If an individual otherwise meets the
requirements for involuntary civil commitment, the State is under no obligation to release
that individual simply because the detention would follow a period of incarceration."). 
Because we have determined that the amended Act continues to be civil in nature, and
because the commitment is not punishment for a prior offense, we conclude that the
commitment proceedings against Miller did not violate double jeopardy principles. See id. 
Issue two is overruled.

Bill of Attainder


 The United States Constitution prohibits Congress and the states from passing bills
of attainder. U.S. Const. art. I, §§ 9, 10. A bill of attainder is "a law that legislatively
determines guilt and inflicts punishment upon an identifiable individual without provision
of the protections of a judicial trial." Nixon v. Adm'r of Gen. Servs., 433 U.S. 425, 468, 97
S.Ct. 2777, 2803, 53 L.Ed.2d 867 (1977) (finding that legislation directing an official of the
legislative branch to take custody of Nixon's papers and tape recordings did not constitute
a bill of attainder). 

 Three inquiries determine whether a statute inflicts punishment: "(1) whether the
challenged statute falls within the historical meaning of legislative punishment; (2) whether
the statute, 'viewed in terms of the type and severity of burdens imposed, reasonably can be
said to further nonpunitive legislative purposes'; and (3) whether the legislative record
'evinces a congressional intent to punish.'" Selective Serv. Sys. v. Minn. Pub. Interest
Research Group, 468 U.S. 841, 852, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984) (quoting Nixon,
433 U.S. at 473, 475-76, 478).

 Under all three of the Selective Service inquiries, the Texas statute does not inflict
punishment. See id. First, "[h]istorically, civil commitment has not been viewed as
punishment." Fisher, 164 S.W.3d at 648. Second, Fisher further notes that "the Act is
rationally connected to its twin goals of 'long-term supervision and treatment.'" Id. at 651
(quoting Tex. Health & Safety Code Ann. § 841.001). Thus, the long-term nonpunitive
purposes of protecting the public from sexually violent predators and of treating persons
found to be sexually violent predators are furthered. Third, as we discussed in issue one, the
legislative history of the amended Act does not show any legislative intent to further punish
sexually violent predators. We conclude that Miller's argument that the Act, as amended,
is a bill of attainder is also without merit, and we overrule issue three. 

Vagueness
 

 In issue four, Miller contends that the statutory definition of "based on sexually
motivated conduct" is impermissibly vague. He argues that the statute is so vague it permits
arbitrary and discriminatory enforcement. See Grayned v. City of Rockport, 408 U.S. 104,
108-09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) ("A vague law impermissibly delegates basic
policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective
basis, with the attendant dangers of arbitrary and discriminatory application."). Miller argues
that 

 the term "based on sexually motivated conduct" and the definition of "sexually
motivated conduct" fail to provide the degree of clarity required by due
process. They fail to provide either adequate notice to those who could fall
within the scope of the amendment or notice of what conduct is forbidden,
rendering Section 841.002 (8) (D) ... unconstitutional-facially and as applied
to Mr. Miller." 


 The vagueness doctrine is derived from the Fifth Amendment's Due Process Clause. 
 United States v. Williams, 76 U.S.L.W. 4275, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008). 
When an appellant brings both a "facial" and an "as applied" challenge, we consider the "as
applied" challenge first. See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455
US. 489, 494-95, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). A party whose conduct "is clearly
proscribed cannot complain of the vagueness of the law as applied to the conduct of others."
Id. at 495. Therefore, we "examine the complainant's conduct before analyzing other
hypothetical applications of the law." Id. If First Amendment rights are not implicated, we
will sustain a vagueness challenge only if the statue is vague in all of its applications. Id. at
494-95, & n.7; see Fisher, 164 S.W.3d at 655 & n.15 (recognizing that appellant may bring
a facial challenge without an "as applied" challenge when First Amendment rights are
involved but noting "heavy burden" of showing unconstitutionality "in every possible
application"). In this case, Miller does not contend that the statute involves any particular
rights affected by the First Amendment.

 Miller's "as applied" argument is brief. He contends that at his commitment trial, 
several different ideas were expressed about the meaning of "sexually motivated conduct."
Miller's entire "as applied" argument states:

 Indeed, at the trial, licensed psychologists, psychiatrists, and lawyers all had
different ideas about what the phrase meant. Dr. Price thought the stab
wounds revealed "sexual thinking." Some theorized that if there was a sexual
encounter before the murder, that somehow the murder was automatically
based on sexually motivated conduct, which would be good enough to make
the murderer a sexually violent predator. The State seemed to think that "I just
have to show that there was some sexually motivated conduct which the
murder was based on either before, during, or after the murder."


Miller's argument, however, overlooks several points: (1) the complete definition of
"sexually motivated conduct" as provided in the statute, (2) his testimony at trial and his
statement, and (3) the entirety of the experts' testimony. 

 The SVP Act defines "sexually motivated conduct" as "any conduct involving the
intent to arouse or gratify the sexual desire of any person immediately before, during, or
immediately after the commission of an offense." Tex. Health & Safety Code Ann. §
841.002(7-a). Section 841.002(8)(D) uses the phrase "sexually motivated conduct" to define
two types of "sexually violent offenses," namely, murder and capital murder that are
"determined beyond a reasonable doubt to have been based on sexually motivated conduct." 
Id. § 841.002(8)(D); see also Tex. Pen. Code Ann. §§ 19.02, 19.03 (Vernon 2003 & Supp.
2007). 

 The Act, thus, defines "sexually motivated conduct" in common terms ("intent to
arouse or gratify the sexual desire"). The statute further limits its context to a particular time
period (conduct occurring "immediately before, during, or immediately after" the offense)
and to particular offenses (murder and capital murder). Tex. Health & Safety Code Ann.
§ 841.002(7-a); see Williams, 128 S.Ct. at 1845; see also Tex. Pen. Code Ann. §§ 19.02,
19.03.

 As applied to Miller, his testimony alone shows that immediately before Stratton's
murder, he was present in her apartment to satisfy his sexual desires. At the commitment
trial, Miller testified that he went to Stratton's apartment that night for "sex." Miller's
statement about the events leading to Stratton's murder showed sexually motivated conduct.

 Miller's testimony is not the only evidence that Miller acted to gratify his sexual
desires "immediately before, during, or immediately after" he murdered Stratton. As outlined
above, two of the three expert witnesses opined that Stratton's murder was "sexually
motivated." 

 While the boundaries of "sexually motivated conduct" as used in the Act may be
difficult to discern, that does not mean it is difficult to determine that Miller's conduct clearly
fell within them. We conclude that the statute is not impermissibly vague as applied to
Miller. As noted above, Miller does not contend that the statute impacts First Amendment
rights. See Hoffman, 455 U.S. at 494-95 & n.7; Fisher, 164 S.W.3d at 655 & n.15. Thus,
because the statute is not impermissibly vague as applied to Miller, it is not impermissibly
vague in all of its applications. See Hoffman, 455 U.S. at 494-95 & n.7; Fisher, 164 S.W.3d
at 655 & n.15. Consequently, Miller fails to meet his burden of showing facial invalidity. 
We overrule issue four.

VI. Jury Charge


 In issues five and six, Miller complains about the jury charge. Issue five argues that
the trial court should have asked the jury to find whether, beyond a reasonable doubt,
Miller's conduct was sexually motivated when he murdered Stratton. Issue six contends that
the trial court erred by failing to define "sexually motivated conduct" in the jury charge. 

 Miller's argument addresses the portion of the charge that posed the following
question to the jury: (1) "Do you find beyond a reasonable doubt that Wesley Miller is a
repeat sexually violent offender?" The charge given by the court further defined "repeat
sexually violent offender" as meaning that "a person has been convicted of more than one
sexually violent offense and a sentence is imposed for at least one of the offenses . . . ." In
turn, the charge also defined "sexually violent offense" as meaning:

 . . . .

 (C) an offense under [Texas Penal Code] Section 30.02, Burglary, if the offense is
punishable under Subsection (d) of that section, (the premises are a habitation and the
party to [the] offense entered the habitation with the intent to commit, attempted to
commit or did commit a felony other than felony theft) and the person committed the
offense with the intent to commit an offense listed in Paragraph (A) or (B); [ (14)]

 (D) an offense under Texas Penal Code, Section 19.02 or 19.03, Murder or Capital
Murder, that during the guilt or innocence phase or the punishment phase for the
offense, during the adjudication or disposition of delinquent conduct constituting the
offense, or subsequently during a civil commitment proceeding trial, is determined
beyond a reasonable doubt to have been based on sexually motivated conduct[.] 

 . . . .


See Tex. Health & Safety Code Ann. § 841.002 (8) (emphasis added). We consider issue
six first.

Sexually Motivated Conduct


 Miller contends that the jury charge also should have contained the statutory definition
of "sexually motivated conduct." Rule 277 of the Texas Rules of Civil Procedure requires
that a trial court submit instructions and definitions that are proper to enable the jury to
render a verdict. See Tex. R. Civ. P. 277. Generally, definitions of legal or technical terms
are included in the charge. See Brookshire Bros., Inc. v. Lewis, 997 S.W.2d 908, 921 (Tex.
App.-Beaumont 1999, pet. denied). Under the Act, "sexually motivated conduct" is "any
conduct involving the intent to arouse or gratify the sexual desire of any person immediately
before, during, or immediately after the commission of an offense." Tex. Health & Safety
Code Ann. § 841.002(7-a). While Miller makes a strong argument that the definition, had
it been given, would have assisted the jury, we first consider whether the alleged error in
refusing his definition was preserved.

 "We review a trial court's decision to submit or refuse a particular instruction under
an abuse of discretion standard of review. The trial court has considerable discretion to
determine necessary and proper jury instructions." In re V.L.K., 24 S.W.3d 338, 341 (Tex.
2000) (citations omitted). Texas's procedural rules, however, provide "that any complaint
to a jury charge is waived unless specifically included in an objection." In re B.L.D., 113
S.W.3d 340, 349 (Tex. 2003) (citing Tex. R. Civ. P. 274; Tex. R. App. P. 33.1(a)(1)). "A
party must make the trial court aware of the complaint, timely and plainly, and obtain a
ruling." Id. (citing State Dep't of Highways & Pub. Transp. v. Payne, 838 S.W.2d 235, 241
(Tex. 1992)). 

 In this case, Miller made no specific objection to the lack of a definition of "sexually
motivated conduct." After hearing arguments on the proposed jury questions, the trial court
asked the parties whether they had other requested questions, definitions, or objections to the
charge. The record of the charge conference shows that Miller's counsel raised numerous
objections and requests. Counsel requested the inclusion of the term "beyond a reasonable
doubt" in the charge's opening paragraph. He requested an instruction that the respondent's
behavioral abnormality must be based on the respondent's present mental state. Counsel
objected to the presence of the phrase "upon the answers made" in instruction 6 and sought
to replace it with "upon each answer made." He requested an instruction that the State had
the burden of proof. He requested a substitute instruction on "behavioral abnormality." He
also requested an instruction on the quantum of proof for determining behavioral
abnormality. But, counsel did not request that the trial court include the statutory definition
of "sexually motivated conduct," or otherwise object when the court did not. 

 At the close of the charge conference, Miller's counsel requested permission to file,
by the following morning, his written "requested definitions and instructions," and he
requested permission to file written objections to the charge. The trial court agreed and
stated: "If . . . on separate pages you will present your definitions you want and the questions
you want, and then I . . . assume they will be consistent with what you presented in your
respondent's proposed jury charge; is that correct, sir?" Counsel responded: "They will,
Your Honor." 

 The next morning, Miller's counsel filed separate requests for the following additions
to the jury charge: (1) a definition on behavioral abnormality; (2) an instruction on quantum
of proof; and (3) questions on whether Miller's conduct was sexually motivated when he
committed the murder and whether he committed the burglary with the intent to commit
aggravated sexual assault. Miller's counsel also filed three objections to the jury charge: (1)
seeking to omit the words "emotional or" from the definition of "behavioral abnormality;"
(2) objecting to the failure to add a characterization of the quantum of proof required on
"behavioral abnormality;" and (3) objecting to the question, "Do you find beyond a
reasonable doubt that Wesley Miller is a repeat sexually violent offender?" and seeking to
add instead a question on whether Miller's conduct was sexually motivated when he
committed the murder. In addition to his requested definition, instruction, questions, and
objections, Miller's counsel filed an alternative charge that is six pages in length. On page
two of the alternative charge we find Miller's proposed definition of "sexually motivated
conduct," a definition that he never sought at the charge conference nor submitted separately
as requested by the trial court. 

 While Rule 273 of the Texas Rules of Civil Procedure "does not prohibit including
the request in a complete charge," the request must not be obscured. Alaniz v. Jones &
Neuse, Inc., 907 S.W.2d 450, 451 (Tex. 1995); see Tex. R. Civ. P. 274. We conclude the
definition of "sexually motivated conduct" that Miller requested was obscured by other
questions, additional definitions, additional instructions, and by his representation to the trial
court on the previous day that the requests would be consistent with those he had asserted at
the hearing. See Munoz v. Berne Group, Inc., 919 S.W.2d 470, 472 (Tex. App.-San Antonio
1996, no writ). The Munoz Court explained that there was "no indication" that counsel
brought the requested instruction to the attention of the court. Id. "Tendering this instruction
to the court in the form of an entire proposed charge, with nothing more, was insufficient to
preserve error." Id. The court noted that counsel raised only one objection at the formal
charge conference and that objection related to another issue. Id. The Munoz Court further
noted that the record did not indicate that Munoz brought his objection about the lack of an
instruction to the trial court's attention. Id. 

 In this case, the record does not show that the trial court was aware Miller wanted the
definition of "sexually motivated conduct" in the charge. Miller's counsel did not request
the definition at the charge conference, though he made several other requests and objections,
and he did not file a separate request for the definition on the morning following the charge
conference as directed by the court. Instead, the definition was obscured in the charge and
never discussed with the court. Consequently, we find that Miller did not make the trial court
reasonably aware of his requested definition. See Alaniz, 907 S.W.2d at 451 (citing Payne,
838 S.W.2d at 241). 

 Because Miller failed to preserve error on his jury instruction argument, we do not 
decide whether the trial court erred in failing to provide the jury with the definition of
"sexually motivated conduct" contained within Miller's charge. We overrule issue six. 



Proposed Jury Question


 In issue five, Miller contends that the trial court should have included an additional
question in the charge. The trial court's charge asked the following questions: (1) "Do you
find beyond a reasonable doubt that Wesley Miller is a repeat sexually violent offender?" and
(2) "Do you find beyond a reasonable doubt that Wesley Miller suffers from a behavioral
abnormality that makes him likely to engage in a predatory act of sexual violence?" Miller
contends that the trial court should have also asked another question, namely whether
Stratton's murder was based on sexually motivated conduct. 

 Miller argues the trial court abused its discretion by refusing to submit "the most
important question in the trial." Miller further contends that the trial court already had
utilized its discretion under Rule 277 to abandon broad-form submission when it submitted
two questions to the jury rather than one. He argues that the court's refusal to submit an
additional question "was arbitrary, unreasonable, and [made] with only selective reference
to guiding principles of law." The State responds that because the trial court tracked the
statutory language and submitted the charge in broad form, the trial court did not abuse its
discretion.

 "A trial court must submit in its charge to the jury all questions, instructions, and
definitions raised by the pleadings and evidence. When feasible, jury questions should be
in broad form, accompanied by appropriate instructions and definitions." Hyundai Motor Co.
v. Rodriguez ex rel. Rodriguez, 995 S.W.2d 661, 663-64 (Tex. 1999) (footnotes omitted); 
see also Tex. Dep't of Human Servs. v. E.B., 802 S.W.2d 647, 649 (Tex. 1990) (upholding
broad-form submission in proceeding to terminate parental rights). "The goal of the charge
is to submit to the jury the issues for decision logically, simply, clearly, fairly, correctly, and
completely. Toward that end, the trial judge is accorded broad discretion so long as the
charge is legally correct." Rodriguez at 664 (footnote omitted).

 From the definitions the trial court gave, the jury knew that a "repeat sexually violent
offender" was a person who had "been convicted of more than one sexually violent offense."
To meet its burden of showing that Miller was a repeat sexually violent offender, the State
presented the jury with evidence of two predicate offenses: the burglary, which is not at
issue in this appeal, and the murder. The charge defined "sexually violent offense" as
including murder or capital murder "determined beyond a reasonable doubt to have been
based on sexually motivated conduct." (emphasis added). The jury question asked whether
Miller was a repeat sexually violent offender. The question, thus, required the jury to
determine that Stratton's murder was sexually motivated, based on the charge definitions and
the evidence before the jury.

 We presume the jury followed the trial court's instructions. See Golden Eagle
Archery, Inc. v. Jackson, 116 S.W.3d 757, 771(Tex. 2003); Turner, Collie & Braden, Inc. v.
Brookhollow, Inc., 642 S.W.2d 160, 167 (Tex. 1982). Thus, presuming the jury followed the
instructions and applied the charge's definition of sexually violent offense to the murder
offense, we find the jury necessarily concluded, beyond a reasonable doubt, that the murder
Miller committed was based on sexually motivated conduct. Otherwise, the jury could not
have followed the instructions and still have found that, beyond a reasonable doubt, Miller
was a repeat sexually violent offender.

 With respect to the disputed issues involved in Miller's trial, we conclude that it was
feasible for the trial court to submit the issues in a broad-form charge. See Crown Life Ins.
Co. v. Casteel, 22 S.W.3d 378, 390 (Tex. 2000). As a result, we hold that the trial court was
not required to submit Miller's separate question about whether Stratton's murder was based
on sexually motivated conduct. We overrule issue five. 

VII. Res Judicata


 In issue seven, Miller contends that the doctrine of res judicata bars the State from
proving that sexual motivations caused him to commit Stratton's murder. Miller argues that
during his murder trial, the State could have litigated whether sexually motivated conduct
caused him to murder Stratton. 

 Res judicata precludes the relitigation of claims that have been finally adjudicated, or
that arise out of the same subject matter and that could have been litigated in the prior action. 
Barr v. Resolution Trust Corp. ex. rel Sunbelt Fed. Sav., 837 S.W.2d 627, 631 (Tex. 1992).

A criminal trial, such as Miller's trial for Stratton's murder, generally resolves the issues of
whether an offender committed the elements of a specific offense beyond a reasonable doubt. 
See Tex. Pen. Code Ann. § 2.01 (Vernon 2003) ("[N]o person may be convicted of an
offense unless each element of the offense is proved beyond a reasonable doubt."). In an
SVP commitment proceeding, however, prior sexually motivated offenses are evidentiary
in nature. Hendricks, 521 U.S. at 362. The offenses assist in demonstrating whether the
offender has a behavioral abnormality and whether he will be dangerous in the future - the
core issues in an SVP case. Id.; see Tex. Health & Safety Code Ann. § 841.003 (a) (2). 
"Present behavioral abnormality" and "future dangerousness" of an alleged sexually violent
predator are not issues that necessarily arise out of the same subject matter litigated during
a prior criminal trial, and there is no showing that they do so here. See Barr, 837 S.W.2d at
628. 

 Further, Miller's civil commitment could not have been litigated at the time of his
murder trial. See Barr, 837 S.W.2d at 628. There was no SVP statute at that time; the statute
was enacted in 1999. See Civil Commitment of Sexually Violent Predators Act, 76th Leg.,
R.S., ch.1188, § 4.01, 1999 Tex. Gen. Laws 4143-52 (codified as amended at Tex. Health
& Safety Code Ann. ch. 841). In addition, Miller points to no provisions in the Code of
Criminal Procedure that would permit a trial court to join criminal and civil proceedings.

 Thus, we conclude that res judicata does not bar the State from showing that Miller's
prior offense was caused by sexually motivated conduct. We overrule issue seven. 

VIII. Child Safety Zone


 In issue eight, Miller contends that the trial court erred when it established a child
safety zone in its commitment order. Miller contends that under the SVP statute, the civil-commitment trial judge must follow the requirements and restrictions applying to child safety
zones established by the Texas Code of Criminal Procedure. See Tex. Code Crim. Proc.
Ann. art. 42.12, § 13B (Vernon Supp. 2007) (community supervision for sexual offenses
against children). Specifically, Miller argues that because the evidence did not establish that
any of his victims were children, the trial court was not authorized to restrict his contact with
children. We disagree. 

 Under the SVP Act, section 841.082 allows the trial court to establish a child safety
zone. In pertinent part, the Act provides:

 (a) Before entering an order directing a person's outpatient civil commitment, the
judge shall impose on the person requirements necessary to ensure the person's
compliance with treatment and supervisions and to protect the community. The
requirements shall include:

 . . . .

 (7) if determined appropriate by the judge, establishing a child safety zone in
the same manner as a child safety zone is established by a judge under Section
13B, Article 42.12, Code of Criminal Procedure, and requiring the person to
comply with requirements related to the safety zone [.] (15)

 . . . . 


 (9) any other requirements determined necessary by the judge.

 . . . . 

Tex. Health & Safety Code Ann. § 841.082 (Vernon Supp. 2007) (emphasis added). 

 Thus, we must determine whether the legislature intended to limit a trial court's
discretion and allow it to create a child safety zone only under the precise circumstances
described in section 13B. See Tex. Code Crim. Proc. Ann. art. 42.12, § 13B. In light of
the broad discretion granted to the trial court in subsection (a)(9) of section 841.082, we
conclude the legislature did not intend to limit the trial court to the 13B criteria. 

 When construing a statute, our objective is determining and giving effect to the
legislature's intent. See Liberty Mut. Ins. Co. v. Camacho, 228 S.W.3d 453, 458 (Tex. App.-
Beaumont 2007, pet. denied). "When the meaning of a word in a statute is not ambiguous,
we ordinarily give the word its common meaning." Id. When determining a word's common
use, we look to commonly-used dictionaries for assistance. Id. But, "our review is not
confined to isolated words, phrases, or clauses; rather, we examine the entire act." Id.; see 
Tex. Gov't Code Ann. § 311.011(a) (Vernon 2005) (instructing courts to construe words
and phrases in context).

 When it passed the SVP Act, the legislature clearly established its intent. Section
841.001 stated: 

 The legislature finds that a small but extremely dangerous group of
sexually violent predators exists and that those predators have a behavioral
abnormality that is not amenable to traditional mental illness treatment
modalities and that makes the predators likely to engage in repeated predatory
acts of sexual violence. The legislature finds that the existing involuntary
commitment provisions . . . are inadequate to address the risk of repeated
predatory behavior that sexually violent predators pose to society. The
legislature further finds that treatment modalities for sexually violent predators
are different from the traditional treatment modalities for persons appropriate
for involuntary commitment . . . . Thus, the legislature finds that a civil
commitment procedure for the long-term supervision and treatment of sexually
violent predators is necessary and in the interest of the state.

Tex. Health & Safety Code Ann. § 841.001 (Vernon 2003). Thus, we construe the Act
to effectuate the legislature's two stated goals: long-term supervision and treatment of
sexually violent predators. 

 The Act allows the judge the discretion to establish a child safety zone for a sexually
violent predator "in the same manner" as a child safety zone is established under Section
13B. "Manner" means "the mode or method in which something is done or happens."
Webster's Third New International Dictionary 1376 (2002). When a child safety
zone is established under 13B, the defendant may not 

 (A) supervise or participate in any program that includes as participants or
recipients persons who are 17 years of age or younger and that regularly
provides athletic, civic, or cultural activities; or


 (B) go in, on, or within 1,000 feet of a premises where children commonly
gather, including a school, daycare facility, playground, public or private youth
center, public swimming pool, or video arcade facility[.] 


Tex. Code Crim. Proc. Ann. art. 42.12, § 13B(1)(A), (B). In this case, the trial court's
order is consistent with 13B's manner of restricting the offender. (16) 

 Given the legislative history of the Act, we conclude that the legislature did not intend
to restrict a trial judge's ability to create a child safety zone to those cases in which the
offender's victims were children. To the extent that the trial court may have deviated from
13B's "manner" of establishing a child safety zone, subsection (a)(9) expressly authorized
the trial court to do so. See Tex. Health & Safety Code Ann. § 841.082(a)(9).

 In this case, Miller's brief concedes that at the time of Stratton's murder, she had only
recently finished high school. Or, as the trial court stated: "Wesley Miller's victims were
aged near majority and could just as easily have been younger." We hold the trial court did
not abuse its discretion in ordering Miller to comply with a child safety zone. 

 Issue eight is overruled. Having overruled all of Miller's issues and arguments, we

affirm the trial court's judgment and commitment order.

 AFFIRMED.




 ______________________________

 HOLLIS HORTON

 Justice



Submitted on December 21, 2007

Opinion Delivered August 28, 2008

Before Gaultney, Kreger, and Horton, JJ.
1. The Sexually Violent Predator Act is located in Title 11, Chapter 841 of the Texas
Health and Safety Code. See Tex. Health & Safety Code Ann. §§ 841.001-841.150
(Vernon 2003 & Supp. 2007). 
2. Certain definitions of "repeat sexually violent offender" are not applicable here, such
as one that also includes offenses for which the person is found not guilty of a sexually
violent offense by reason of insanity. See id. § 841.003(b) (1), (2) (Vernon 2003). 
3. "Come on" is a slang term, one of the meanings of which is "to make a sexual
advance." 1 Random House Historical Dictionary of American Slang (J. E. Lightner ed.,
Random House 1994). 

4. The fourteen states recognized in Fisher were: (1) Arizona, (2) California, (3)
Florida, (4) Illinois, (5) Iowa, (6) Kansas, (7) Massachusetts, (8) Minnesota, (9) Missouri, 
(10) New Jersey, (11) North Dakota, (12) South Carolina, (13) Washington, and (14)
Wisconsin. See In re Commitment of Fisher, 164 S.W.3d 637, 646 (Tex. 2005).
5. The Kennedy factors include:


 (1) whether the sanction involves an affirmative disability or restraint; (2)
whether it has historically been regarded as a punishment; (3) whether it comes
into play only on a finding of scienter; (4) whether its operation will promote
the traditional aims of punishment-retribution and deterrence; (5) whether the
behavior to which it applies is already a crime; (6) whether an alternative
purpose to which it may rationally be connected is assignable for it; and (7)
whether it appears excessive in relation to the alternative purpose assigned.


Id. at 647 (citing Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69, 83 S.Ct. 554, 9
L.Ed.2d 644 (1963)).
6. Ariz. Rev. Stat. § 36-3701(6)(b), (7)(a) (LexisNexis 2008); Fla. Stat. Ann. §
394.912 (8), (9)(h), 10 (LexisNexis 2008); 725 Ill. Comp. Stat. Ann. § 207/5 (d), (e)(2),
(f) (LexisNexis 2008); Iowa Code Ann. § 229A.2 (9), (10)(g), (11) (LexisNexis 2008); 
Kan. Stat. Ann. § 59-29a02 (a), (d), (e)(13) (LexisNexis 2008); Wash. Rev. Code Ann.
§§ 9.94A.030(43); 71.09.020(15) (LexisNexis 2008).
7. See Ariz. Rev. Stat. § 36-3701(6)(b); Fla. Stat. Ann. § 394.912(9)(h); Iowa Code
Ann. § 229A.2(10)(g); Kan. Stat. Ann. § 59-29a02(e)(13); Wash. Rev. Code Ann. §
71.09.020(15).
8. See Ariz. Rev. Stat. § 36-3701(7)(a) (LexisNexis 2008); Cal. Welf.& Inst. Code
§ 6600(a)(1) (LexisNexis 2008); Fla. Stat. Ann. § 394.912(10) (LexisNexis 2008); 725 Ill.
Comp. Stat. Ann. § 207/5 (f) (LexisNexis 2008); Iowa Code Ann. § 229A.2(11)
(LexisNexis 2008); Kan. Stat. Ann. § 59-29a02(a) (LexisNexis 2008); Mass. Ann. Laws 
ch. 123A, § 1 (LexisNexis 2008); Mo. Ann. Stat. § 632.480(5)(a) (LexisNexis 2008); N.H.
Rev. Stat. Ann. § 135-E:2(XII)(a) (LexisNexis 2008); N.J. Stat. Ann. § 30:4-27.26
(LexisNexis 2008); N.Y. Mental Hyg. Law § 10.03(g)(1) (LexisNexis 2008); S.C. Code
Ann. § 44-48-30(1)(a) (LexisNexis 2008); Va. Code Ann. § 37.2-900 (LexisNexis 2008);
Wash. Rev. Code Ann. § 71.09.020(16) (LexisNexis 2008); Wis. Stat. Ann. § 980.01(7)
(LexisNexis 2007). 
9. "'Behavioral abnormality' means a congenital or acquired condition that, by affecting
a person's emotional or volitional capacity, predisposes the person to commit a sexually
violent offense, to the extent that the person becomes a menace to the health and safety of
another person." Tex. Health & Safety Code Ann. § 841.002(2).

 
10. See 2005 Tex. Gen. Laws 2890-93.
11. The inclusion of "sexually motivated" offenses in the definition of sexually violent
offenses did not originate in Texas. Other states, including Arizona, Florida, Illinois, 
Washington, and Wisconsin, had such statutes several years before Texas considered the
amendments in 2005. See In re Commitment of Taylor, 78 P.3d 1076, 1080 n.4 (Ariz. Ct.
App. 2003) (explaining that statute defining "sexually motivated" for SVP purposes was
enacted in 1995); Barker v. State, 877 So.2d 59, 60 (Fla. 4th Dist. Ct. App. 2004) (explaining
that in prosecuting a 1999 SVP commitment petition based on burglary as predicate offense,
State was required to prove beyond reasonable doubt that the burglary was a sexually
motivated offense); In re Detention of Samuelson, 727 N.E.2d 228, 231-32 (Ill. 2000)
(explaining that SVP statute defines sexually violent offense to include "first degree murder,
if it is determined by the agency with jurisdiction to have been sexually motivated..."); In re
Stout, 150 P.3d 86, 90, 99 (Wash. 2007) (affirming court of appeals decision upholding 2003
SVP commitment based on burglary that was sexually motivated); State v. Watson, 595
N.W.2d 403, 409 (Wis. 1999) (explaining in a 1999 opinion that certain offenses, such as
false imprisonment, can be predicate offenses for SVP commitment if the offenses were
determined to be "sexually motivated"). 
12. Under common law, attainder was "the act of extinguishing a person's civil rights
when that person is sentenced to death or declared an outlaw for committing a felony or
treason." Black's Law Dictionary 137 (8th ed. 2004).
13. The Double Jeopardy Clause provides: "[N]or shall any person be subject for the
same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V.
14. Paragraphs (A) and (B) of the charge designated the following as "sexually violent
offenses": indecency with a child, sexual assault, aggravated sexual assault, and aggravated
kidnapping if the person committed the offense with the intent to violate or abuse the victim
sexually. 
15. Under 13B, the trial court "shall establish" a child safety zone if the defendant's
victim was a child as defined by section 22.011 of the Penal Code (sexual assault). The
Penal Code defines a child as "a person younger than 17 years of age who is not the spouse
of the actor." Tex. Pen. Code Ann. § 22.011(c) (Vernon Supp. 2007).
16. The trial court's commitment order provided as follows:


 7. A child safety zone is established such that Wesley Miller shall not:


 a. supervise or participate in any program that includes as
participants or recipients persons who are 17 years of age or
younger and that regularly provides athletic, civic, or cultural
activities; or 

 b. go in, on, or within 1,000 feet of a premises where children
commonly gather, including a school, day-care facility,
playground, public or private youth center, public swimming
pool, or video arcade facility.