

# NUMBER 13-22-00467-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN RE THE COMMITMENT OF GARY NOLAN

### On appeal from the 290th District Court
### of Bexar County, Texas.

## MEMORANDUM OPINION

**Before Justices Tijerina, Silva, and Peña**
**Memorandum Opinion by Justice Tijerina**

The State of Texas filed a petition to civilly commit appellant Gary Nolan as a sexually violent predator ("SVP") under the Sexually Violent Predator Act ("SVP Act"). *See* TEX. HEALTH & SAFETY CODE ANN. §§ 841.001–151. A jury found that Nolan is an SVP as he suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. *Id.* § 841.003(a). The trial court entered a final judgment and an order of civil commitment under the SVP Act. By one issue, Nolan contends that the evidence was factually insufficient to support a finding that he is an SVP beyond a

reasonable doubt. We affirm.[1]

## I.  THE SVP ACT

The Legislature enacted the SVP Act in 1999 providing for the civil commitment of SVPs based on legislative findings that "a small but extremely dangerous group of sexually violent predators exists and that those predators have a behavioral abnormality that is not amenable to traditional mental illness treatment modalities and that makes the predators likely to engage in repeated predatory acts of sexual violence." *In re Commitment of Harris*, 541 S.W.3d 322, 325 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (citing TEX. HEALTH & SAFETY CODE ANN. § 841.001). The Legislature found it was in the interest of the State to provide a civil commitment procedure for the long-term supervision and treatment of sexually violent predators. *Id.* For the State to file suit under the SVP Act, a person must be administratively determined to be a sexually violent predator. *Id.* (first citing TEX. HEALTH & SAFETY CODE ANN. §§ 841.021–.023; then citing *In re Commitment of Bohannan*, 388 S.W.3d 296, 298 (Tex. 2012)).

## II.  STANDARD OF REVIEW AND APPLICABLE LAW

Although the commitment of a person as an SVP is a civil proceeding, the SVP Act requires for the State to prove beyond a reasonable doubt that a person is an SVP. *Id.* (citing *In re Commitment of Fisher*, 164 S.W.3d 637, 645–53 (Tex. 2005)). Upon our factual sufficiency review, we must determine "whether, on the entire record, a reasonable factfinder could find beyond a reasonable doubt that the defendant is" an SVP. *In re*

---

[1] This appeal was transferred to this Court from the Fourth Court of Appeals in San Antonio, Texas pursuant to a docket-equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001.

2

*Commitment of Stoddard*, 619 S.W.3d 665, 668 (Tex. 2020). In other words, "the evidence is factually insufficient if, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the SVP finding, along with the undisputed facts that do not support the finding, is so significant that the factfinder could not have found beyond a reasonable doubt that the statutory elements were met." *Id.* at 674–75.

We are not permitted to "usurp the jury's role of determining the credibility of witnesses and the weight to be given their testimony." *Id.* at 674. Additionally, we "must presume that the factfinder resolved disputed evidence in favor of the finding if a reasonable factfinder could do so." *Id.* "If the remaining evidence contrary to the finding is so significant in light of the entire record that the factfinder could not have determined beyond a reasonable doubt that its finding was true, the evidence is factually insufficient to support the verdict." *Id.* at 668.

A person is an SVP if the person (1) "is a repeat sexually violent offender," and (2) "suffers from a behavioral abnormality that makes [him] likely to engage in a predatory act of sexual violence." TEX. HEALTH & SAFETY CODE ANN. § 841.003(a). A behavioral abnormality is defined as "a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id.* § 841.002(2). A predatory act is "an act directed toward individuals, including family members, for the primary purpose of victimization." *Id.* § 841.002(5).

3

# III. DISCUSSION

By his sole issue, Nolan challenges the factual sufficiency of the evidence supporting the jury's finding that he suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. Specifically, Nolan argues that the evidence is factually insufficient to support the jury's finding that he has serious difficulty controlling his behavior.

Nolan claims that undisputed facts that do not support the jury's verdict are as follows: (1) although there is evidence that Nolan "suffers from pedophilia . . . there is no indication that Nolan experienced sexual attraction at the onset of puberty towards children"; (2) Dr. Darrell Turner, the State's expert witness, admitted that Nolan's conviction in 2001 for a sexual violent offense against his five-year-old niece does not give "rise to [a] risk factor for sexual recidivism"; (3) Dr. "Turner conceded that Nolan's denial (that he sexually abused his niece and goddaughter) does not, in and of itself, affect his risk for sexually-violent recidivism"; (4) Nolan, although arrested, was not convicted of the offense of "coercing a teenaged boy to perform oral sex"; (5) Nolan "does not stand out in a large crowd" because his diagnosis of antisocial personality is a "condition . . . shared by approximately seventy-two percent of adult male prisoners"; (6) Nolan has not been disciplined in prison for sexual misconduct; (7) "Psychopathic traits do not predispose a person to commit a sexually violent offense and do not affect a person's status as a menace to the health and safety of other persons"; (8) there are protective mitigating factors, such as Nolan's age, familial support and completion of the Overcomers program; and (9) although Nolan is serving two thirteen-year concurrent

4

sentences for sexually violent offenses, "he is not a recidivist in the classical sense" because "this is his first trip to the penitentiary."

Next, Nolan asserts that there are "[d]isputed, unreasonable facts" that support the jury's verdict as follows: (1) Nolan denied that he sexually abused his niece and goddaughter who were "coached to accuse" him "of sexual misconduct toward them, were vengeful, and were extorting him"; (2) Nolan's score for recidivism was within "the average risk range"; (3) Nolan pleaded guilty to sexually abusing his niece because he was "coerced" to do so; (4) Nolan did not seek treatment for substance abuse because "he had no problem with alcohol dependency"; (5) Nolan does not regard himself as a sex offender because he testified that he has not sexually abused anyone and does not need sex offender treatment; (6) Nolan's medical problems and fact that he "is not very ambulatory [calls] into question his ability to sexually abuse another person"; (7) Nolan denied that he is a member of the Aryan Brotherhood, and he is disqualified from membership "due to the nature of his convictions"; (8) Nolan disagrees with Dr. Turner's diagnosis that he suffers from antisocial personality, and "[h]e has no difficulty with rules and authority and has empathy for the plight of other persons"; (9) Nolan does not have "alcohol use disorder" because since he was arrested, "he hasn't consumed"; and (10) "Nolan believes that he has always been in control of his sexual urges, is not a menace to other persons, and does not have a behavioral abnormality that makes him likely to reoffend."

## A.    "Typical Recidivist"

It appears that one of Nolan's complaints focuses on whether the evidence is

5

factually sufficient to prove beyond a reasonable doubt that he is not just a "typical recidivist" and part of the small but extremely dangerous group of SVPs. However, in a civil commitment case, the State does not need to prove that Nolan is a member of the small but extremely dangerous group of SVPs or that Nolan is not just a "dangerous but typical recidivist." *See In re Commitment of Stoddard*, 619 S.W.3d at 677 ("This 'small but extremely dangerous group' language, contained in the [SVP] Act's legislative findings, is not part of the statute's definition of [SVP] and was not an element the jury was required to find."). Instead, the State only needed to prove beyond a reasonable doubt that Nolan is an SVP. *See* TEX. HEALTH & SAFETY CODE ANN. § 841.062(a). Thus, the State was not required to compare Nolan "to other adjudicated SVPs with predicate offenses and criminal histories that were sustained and [more] egregious" than Nolan's acts because "that is simply not what the [SVP] Act requires." *In re Commitment of Stoddard*, 619 S.W.3d at 678.

**B.    Behavioral Abnormality and Likely to Engage in a Predatory Act of Sexual Violence**

Therefore, we will focus our analysis on whether the evidence is factually sufficient to support the jury's finding that Nolan "suffers from a behavioral abnormality that makes [him] likely to engage in a predatory act of sexual violence," in that he has "a congenital or acquired condition that, by affecting [his] emotional or volitional capacity, predisposes [him] to commit a sexually violent offense, to the extent that [he has] become[] a menace to the health and safety of another person." *See* TEX. HEALTH AND SAFETY CODE ANN. § 841.002(2); *In re Commitment of Stoddard*, 619 S.W.3d at 678. Most of Nolan's listed undisputed evidence and "[d]isputed, unreasonable facts" relied upon by the jury are

6

merely complaints relating to the weight of the evidence and the jury's decision to either believe or disbelieve his testimony. However, "the jury may resolve conflicts in the evidence and remains the sole judge of witnesses' credibility and the weight to be given their testimony." *In re Commitment of Stoddard*, 619 S.W.3d at 676 n.12. Thus, the jury was able to disbelieve all or any part of Nolan's testimony contradicting Dr. Turner's testimony. *See id.* In addition, we must presume that all conflicts in the evidence were resolved by the jury in this case. *See id.*

Dr. Turner testified that he has a doctorate degree in clinical psychology and provided a description of his education, training, and experience. Dr. Turner stated the statutory definition of "behavioral abnormality" and explained his understanding of its meaning. Specifically, Dr. Turner explained that a behavioral abnormality is a term used to identify any mental condition that the defendant was either born with, acquired, or both. "It's just not excluding any conditions[;] It's more of a conclusive definition."

Dr. Turner said that his evaluation of a behavioral abnormality is based on risk factors that have been shown through research that if "present in the picture of the profile of this offender" then that offender will "be a higher risk to reoffend than other offenders or the average risk of offenders." Dr. Turner explained that as the risk factors increase and are not "mitigated by protected factors, then [the] risk level continues to rise and rise and rise[,] and [the defendant] become[s] a very high-risk sex offender." According to Dr. Turner, "emotional capacity . . . refers to one's ability to control . . . emotions in a situation where" there are heightened emotions and "volitional control refers to . . . overt behavior" that is exhibited during a heightened emotional state. For example, "Is the person able to

7

control their behavior, or do they have serious difficulty doing that?"

In addition, Dr. Turner explained that when he analyzes whether the defendant is likely to reoffend, he is not predicting the future, and he is "not going to tell you what percentage he is likely to reoffend compared to other sex offenders or anything like that." Instead, Dr. Turner said, "I[ a]m going to compare his risk to a general sex offender and then tell you why I think that way" and then "tell[] this Court that based on my education, training and experience it is my opinion that [Nolan] suffers from [a] behavioral abnormality that predisposes him to engage in predatory acts of sexual violence." According to Dr. Turner, "a predatory act . . . has the primary purpose of victimization—creating it." Dr. Turner testified that Dr. Jorge Varela, who did not testify, previously performed an evaluation of Nolan finding that Nolan suffers from a behavioral abnormality—Dr. Turner agreed with the conclusion.

Dr. Turner employed a clinically adjusted actuarial approach which required him to first review records pertaining to Nolan's history and then perform an in-person evaluation of Nolan.[2] During this approach, Dr. Turner employed psychological instruments, identified and weighed empirically supported risk factors and protective factors, and then made his diagnosis. Dr. Turner considered the information available and then rendered an opinion.

---

[2] Specifically, Dr. Turner testified as follows:

I reviewed information about the investigations into the sexual offenses, including victim statements, interviews with [Nolan] at the time and court documents, my deposition, his deposition, some victim statements that were recorded, information about his behavior while he's been in prison, information about his nonsexual criminal history, medical/psychiatric, substance use history, sexual history. All of that stuff was included in the records.

8

Dr. Turner opined that there are three overall risk factors that indicate that Nolan has a behavioral abnormality and will reoffend, which include the following: (1) "his degree of antisociality, which scores in the severe range of psychopathy"; (2) "his sexually deviant interest[s], which are chronic and related to children, possibly males and females, and the fact that he's been in trouble"; and (3) his arrest record. Dr. Turner explained that sexual deviance "is a sexual interest, a sexual arousal that would require victimization of another person or a societal norm in order to satisfy it."

Dr. Turner said, "It's been brought to his and other's attention that he's committed a crime against a child and he's gone on to continue to commit crimes against children and that speaks directly to a behavioral abnormality." According to Dr. Turner, someone, like Nolan, who suffers from both sexual deviance and extreme antisociality leads to a conclusion that person is "going to victimize other people, is going to take money from other people and usually have a criminal behavior and pathological lying" while on the other hand, someone who only has sexual deviance without antisociality will have remorse for his actions and have empathy for the victim leading him to stop himself from acting on those urges by perhaps seeking therapy. Dr. Turner said, "when there's a sexually deviant interest that requires victimizing someone to satisfy it and you're so antisocial that you're okay with doing that, then research has shown that exponentially increases a person's risk." Dr. Turner believes that Nolan is such a person.

According to Dr. Turner, Nolan's sexual deviance is pedophilic disorder, and Nolan "is extremely sexually preoccupied, and his sexual fantasies that he discussed with me were quite disturbing"; however, Nolan did not "recognize it as disturbing." Dr. Turner

9

stated that Nolan's inability to recognize how disturbing his sexual fantasies are "is even more disturbing." Nolan told Dr. Turner that he fantasized about having sex with a dead body, and he had read about the topic, which "seemed very interesting to him." Dr. Turner explained that Nolan is "talking to someone that he's never met," that is "conducting a risk assessment of him," and he is using inappropriate language. Specifically, Dr. Turner stated that Nolan had "read a story about having sex with a dead body. He has visualized how it would be. It would be cold . . . . [with] no feedback and it would feel like a wet sock." Dr. Turner explained that he saw a pattern that Nolan talked about "no feedback" not only during his evaluation of Nolan "but in his deposition and statements to police . . . talking about females and even males and even the child victims . . . he said he looked at them almost like a pet or a piece of machinery." Dr. Turner found Nolan's "depersonalization" concerning.

Nolan told Dr. Turner in detail about his fantasy the last time that he masturbated to a picture of a pregnant woman. Dr. Turner asked Nolan if he had fantasies about boys. Nolan said, "Boys no . . . Men have a stronger jaw." Dr. Turner testified about other instances that he felt Nolan made callous statements about sexual acts which Dr. Turner found disturbing and evidence of Nolan's sexual deviance and antisociality.[3]

The evidence shows that Nolan was convicted of two violent sexual offenses. In one offense, as described by Dr. Turner, Nolan sexually assaulted his niece when she was five years old on multiple occasions by penetrating her vagina and anus, and he was

---

[3] Nolan described himself as a "mountain man" meaning that "he'll mount anything with a hole in it." Dr. Turner said this shows Nolan's callous and victimization attitude towards others.

10

charged with seven counts of sexual abuse of a child and found guilty of one count of indecency with a child and sentenced to thirteen years' confinement.

Dr. Turner reviewed the video interview of the niece wherein she claimed that Nolan first showed her pornography and tickled and wrestled with her. Nolan isolated the niece, talked to her about the pornography he showed her, and asked her "to act out what she saw in the pornography." According to Dr. Turner, these acts are "some pretty classic grooming behavior." Dr. Turner opined that "grooming behaviors speak directly to sexual deviance and manipulation and antisociality and in this case psychopathy." In addition, there is "callousness and lack of remorse and conning and manipulation and pathological lying." Dr. Turner testified that under the "general consensus in the field," an adult that grooms children for sex "sees a child as a sexual object and a source of sexual attraction." In addition, "they attribute sexual motivations and thoughts and desires to those children."

According to Dr. Turner, the niece moved away, and when she subsequently visited Nolan as a "young adolescent," he locked her in the bathroom, asked her if she remembered what he had done to her, and tried to kiss her. Dr. Turner opined that Nolan asked the niece if she remembered the sexual encounters because "he's seeing it as a consensual pleasant memory of sex with this female [child], and he's wanting to relieve it . . . ." In addition, based on his research, Dr. Turner believed that Nolan's behavior with the niece was motivated by "revictimization" in that he wants to ensure that the niece did not "forget what happened" and "what [he was] capable of."

Dr. Turner said that when Nolan committed the offenses against his niece, he had been previously arrested and charged with a sex offense, and the fact that he was willing

11

to commit the second offense against his niece while being under scrutiny for another offense is another risk factor. In addition, Nolan was on "supervised release for another crime while he committed [the offense against his niece]," which is another risk factor Dr. Turner considered. Dr. Turner also considered that Nolan stated that he may have been under the influence of substances as another risk factor.

Nolan also sexually assaulted his three-year-old goddaughter. The goddaughter said that she and Nolan watched "lollipop movies, and he touches my butt." The record indicated that the goddaughter claimed that Nolan inserted his thumb in her anus and that the "lollipop movies" were actually pornographic movies. In addition, Nolan was on probation when he was arrested for this offense, and "there was allegations once again of oral, anal and vaginal sex with a [three]-year-old." According to Dr. Turner, Nolan ejaculated in the goddaughter's mouth, who described it as "spit coming out." Dr. Turner opined that such a "level of deviance and offending behaviors that we're seeing are cause for concern in terms of risk" because eventually the goddaughter will realize what occurred.

Dr. Turner testified that in 1996, Nolan was arrested for "forcing" a teenage boy "to perform oral sex on him." Dr. Turner stated that with two female victims and now a male victim "occurring over time" the risk increases; "That's a risk factor, male offenders with male victims." Dr. Turner said that although Nolan was not convicted of the offense, he still considers that charge in his analysis. Dr. Turner also considered an incident wherein Nolan admitted he had sexual intercourse with his sister-in-law, "who may have been disabled." Dr. Turner testified that Nolan denies the offenses he committed and has not

taken any responsibility for his actions, which Dr. Turner found significant to his opinion.

Dr. Turner also considered Nolan's nonsexual criminal history, which includes six arrests. Dr. Turner testified that usually sex offenders do not have "a lot of criminal behavior," while in this case, Nolan has that history "[s]o, his antisociality as a risk factor is through the roof." In addition, while in prison, Nolan has had "disciplinaries" for fighting and threatening and assaulting staff. Dr. Turner stated that Nolan showed a protected factor of not committing any sexual offenses while in prison; however, that did not affect or change Dr. Turner's opinion.[4] Dr. Turner opined that to conclude that Nolan has a behavioral disorder, he reviewed in combination Nolan's pedophilic disorder, antisociality, alcohol use disorder, and psychopathy,[5] and he reviewed "the way that [Nolan] has responded to them," those diagnosis, which "have affected his ability to control his behavior and emotions."

According to Dr. Turner, when he interviewed Nolan, "he denied everything outright," and he denigrated the victims and their families claiming that the children were coached and the families sought revenge and money. Dr. Turner testified that Nolan's denial and claims were "completely uncredible in everything that I've heard from just about every offender I've spoken to." Dr. Turner stated that Nolan has always denied that he sexually abused the niece; however, in a recorded statement to police, Nolan told "the

---

[4] Dr. Turner explained that a "protective" or "positive" factor is "something that can . . . lower a person's risk of reoffending." Dr. Turner stated that other protective factors shown here are Nolan's age, his contact with his family, social support, and his completion of a program called "Overcomers." These protective factors did not change Dr. Turner's opinion because he factored them in to his analysis of Nolan.

[5] Nolan scored a 33 on the instrument used by Dr. Turner to determine Nolan's level of psychopathy, which is in the "range of having a severe degree of psychopathy characteristics." Dr. Turner clarified that psychopathy is not a diagnosis but is a part of the antisociality diagnosis. On cross-examination, Dr. Turner stated that when another doctor tested Nolan, he scored higher on the instrument.

13

police that maybe he blacked out and was masturbating in . . . his room when she walked in." Dr. Turner opined that Nolan "[d]esparately" needs to enroll in sex offender treatment. Dr. Turner testified that based on his review of Nolan, Nolan has a behavioral abnormality and is likely to engage in a predatory act of sexual violence.

On cross-examination, Dr. Turner said that Nolan "threatened to gouge" out Dr. Turner's eyes "and made a joke about it." Dr. Turner revealed that Nolan admitted that he had viewed child pornography. Dr. Turner testified that antisociality is found in approximately seventy to seventy-two percent of the general prison population, while it makes up about two to three percent of the general population. Dr. Turner clarified that Nolan was not convicted in 1996 because the victim did not "show up for trial." Dr. Turner stated that Nolan's "antisociality is still raging": "He described himself to me, quote, as very antisocial, very aggressive, short temper, bottle syndrome, exploding and then just the callousness and the way he discussed these things and the jokes he thought were appropriate, this is active, active antisociality." Dr. Turner acknowledged that there is no evidence that Nolan has continued drinking alcohol while in prison; however, Nolan told Dr. Turner that he brews "200 proof White Lightning" in prison as "his hustle." Dr. Turner testified that Nolan's behavioral abnormality affects his emotions based on his "history of acting out violently. He's admitted that. And then I think emotions do play into, especially for a pedophile . . . the sexual abuse because there is identification with children emotionally for pedophiles." Dr. Turner stated that because Nolan denies that he committed the offenses, he refused sex offender treatment in prison. Dr. Turner testified that sex offender treatment is "absolutely" necessary "for someone with a behavioral

14

abnormality."

Nolan testified that he did not sexually abuse his niece. Nonetheless, Nolan acknowledged that he accepted a plea of guilty. However, he claimed that he had been "managed and coerced" into accepting the plea of guilty to the offense of indecency with a child by contact. Nolan denied being sexually attracted to his niece. When asked by his trial counsel if he "cared" about his goddaughter, Nolan replied, "No." He clarified that he did not care for her "emotionally." Nolan admitted that during his deposition he stated that he cared about his goddaughter as much as he cared about his dog. Nolan denied sexually abusing his goddaughter. Nolan was asked about the amount of pornography in his home while he took care of children. Nolan claimed that parents "forced either me or my ex-wife to watch [their children] while they were gone." Nolan claimed that pictures taken by police officers of pornographic materials strewn about his home had been manufactured by the police.

Nolan stated that he did not recollect getting in trouble with the police when he was a juvenile. Nolan acknowledged that he has been arrested for nonsexual offenses six times for unlawfully carrying a weapon and theft, among other things. Nolan stated that his probation had been revoked in all his nonsexual criminal cases, but he denied that he has a hard time following the rules. Nolan denied threatening a prison guard and said that he prayed for the guard who misinterpreted his statement. Nolan admitted that he threw a hot plate of food and a water bowl at a prison guard. Nolan however claimed that the guard had instigated his actions by calling Nolan "a smidgen punk." Nolan stated that he did not "need" sex offender treatment. Nolan said that he is not sorry for anything that

15

happened because he did not sexually abuse anyone. Nolan disagreed with Dr. Turner's diagnosis and opinions.

Having reviewed the entire record, we cannot conclude that there is any contrary evidence so significant that the factfinder could not have determined beyond a reasonable doubt that Nolan is a repeat sexually violent offender who suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. *See In re Commitment of Stoddard*, 619 S.W.3d at 668. Accordingly, we hold that the evidence is factually sufficient to support the jury's finding and the judgment granting commitment. *See id.* at 678. We overrule Nolan's second issue.

## IV. CONCLUSION

We affirm the trial court's judgment.

JAIME TIJERINA
Justice

Delivered and filed on the
10th day of August, 2023.

16